**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 1, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MORGAN EMMETT,

     Plaintiff - Appellant,

v.

SHANNON ARMSTRONG, in his
individual capacity; CHIEF BILL
BRENNER, in his official capacity as
Greybull Police Department Chief,

     Defendants - Appellees.

No. 18-8078

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:17-CV-00182-SWS)**
_____

Letitia C. Abromats, Letitia C. Abromats, PC, Greybull, Wyoming, for Plaintiff-
Appellant.

Ewa C. Dawson, Senior Assistant Attorney General, State of Wyoming (Michael J.
McGrady, Deputy Attorney General; Daniel E. White, Senior Assistant Attorney
General; Justin A. Daraie, Senior Assistant Attorney General, on the brief), Cheyenne.
Wyoming, for Defendant-Appellee Armstrong.

Richard Rideout, Law Office of Richard Rideout, PC, Cheyenne, Wyoming, for
Defendant-Appellee Brenner.
_____

Before **PHILLIPS**, **EBEL**, and **O'BRIEN**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

While responding to reports of a fight at an Elks Club in Greybull, Wyoming, Officer Shannon Armstrong arrested Morgan Emmett for interfering with a peace officer. Officer Armstrong effectuated Emmett's arrest by tackling him and then tasing him. Emmett brought a 42 U.S.C. § 1983 suit, claiming that Officer Armstrong violated his Fourth Amendment rights by unreasonably seizing him when arresting him without probable cause and by using excessive force when using his taser to effectuate the arrest. Emmett also brought a failure-to-train claim against Police Chief Bill Brenner, in his official capacity. The appeal before us arises from the district court's order granting summary judgment to Officer Armstrong on the basis of qualified immunity on all claims and to the city for lack of a constitutional violation. We affirm in part and reverse in part.

Emmett's unreasonable seizure claim is based entirely on Officer Armstrong's failure verbally to identify himself as a police officer before seizing Emmett, thus precluding probable cause to believe Emmett knowingly interfered with a peace officer. Because there were significant indicia from the circumstances that Officer Armstrong was a police officer, it was objectively reasonable for Officer Armstrong to believe that Emmett knew he was a police officer. Thus, because the arrest was not a constitutional violation, Officer Armstrong is entitled to qualified immunity. Consequently, we AFFIRM the district court's grant of summary judgment as to Emmett's unreasonable seizure claim.

Emmett's second claim alleges that Officer Armstrong's use of his taser constituted excessive force when it was used without adequate warning and after

2

Emmet has ceased actively resisting. We agree with Emmett that a jury could find that such conduct constitutes excessive force. Moreover, it was clearly established at the time of these events that using a taser without adequate warning against a misdemeanant who has ceased actively resisting is unreasonable. Because Emmett's excessive force claim alleges a clearly established violation of the Fourth Amendment, Officer Armstrong is not entitled to qualified immunity on that claim. Thus, we REVERSE the district court's grant of summary judgment as to Emmett's excessive force claim.

Finally, the district court granted summary judgment to Chief Brenner on Emmett's third claim solely because it did not find a constitutional violation that could support a failure-to-train claim. However, because we reverse the district court's finding that no constitutional violation occurred insofar as the excessive force claim is involved, we also REVERSE the district court's grant of summary judgment on Emmett's failure-to-train claim against Chief Brenner in his official capacity to the extent that it relates to Officer Armstrong's use of force.

Hence, exercising our jurisdiction under 28 U.S.C. § 1291, we AFFIRM in part, REVERSE in part, and REMAND the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

Before getting into the facts, we emphasize that this case arises from a grant of summary judgment. When reviewing a grant of summary judgment, we, like the district court, must view the evidence, and all inferences arising from that evidence,

3

in the light most favorable to the nonmoving party. See Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." Scott v. Harris, 550 U.S. 372, 378 (2007). When the record on appeal contains video evidence of the incident in question, however, we will accept the version of the facts portrayed in the video, but only to the extent that it "blatantly contradict[s]" the plaintiff's version of events. Id. at 380; see Kapinski v. City of Albuquerque, 964 F.3d 900, 903 n.2 (10th Cir. 2020) ("We relay here only what is indisputably shown by the videos, and therefore necessary to take as a matter of fact.").

Here, the record contains video footage from the body camera worn by Officer Armstrong on the night in question. Thus, we accept Emmett's version of the story to the extent that it is not "so utterly discredited by the record that no reasonable jury could have believed him," Scott, 550 U.S. at 380, and we rely on the video footage only where it "blatantly contradict[s]" Emmett's story. Id. (emphasis added).

In October 2013, Emmett was attending a wedding and reception at the Elks Club in Greybull, Wyoming. Two 911 calls were placed after a misunderstanding led to the belief that there was a fight; no fight had, in fact, occurred. Several police officers, including Officer Armstrong, responded to the call, in uniform and in marked police vehicles—the police vehicles had blue and white lights flashing throughout the incident.[1] Officer Armstrong observed a group of people standing

---

[1] The extent of the flashing lights and police presence is clear from the video footage.

4

behind a large planter in the parking lot and next to a pickup truck. Officer Armstrong directed the group to "shut up and stand there." (App. 292 at 0:32.) One of the men, Roger Lancaster, responded, "That's not appropriate," after which Officer Armstrong directed Lancaster to "spin around," and he handcuffed Lancaster and put him in the backseat of the police car, which was parked approximately fifteen yards from the pickup truck. (Id. at 0:32-0:40.) After placing Lancaster in the police car, Officer Armstrong spoke to a group of people in front of the Elks Club and asked who had been fighting. A woman answered "Morgan Emmett," and Officer Armstrong returned to the group of men at the pickup. (Id. at 1:27-1:29.) One of the men began moving away from the pickup as Officer Armstrong approached, and Officer Armstrong directed him to move back to the pickup; the man complied.

As Officer Armstrong approached the front of the pickup, Emmett, who was standing by the back, began to walk away from the pickup. Officer Armstrong called after him, yelling "Morgan, Morgan. Come here." (Id. at 1:50-1:52.) Emmett glanced back behind him and continued walking away. Officer Armstrong was moving towards Emmett and, at that point, Emmett began running. Officer Armstrong chased Emmett for a short distance, yelling "stop" once before catching up with Emmett, and then yelling "stop" once more as he tackled Emmett to the ground. (Id. at 1:56-2:01.)

Once Officer Armstrong regained his footing, he stood over Emmett, who lay on his back on the ground. Once Emmett was on his back, he became visibly relaxed, and he made no further movements indicating an attempt to run or fight

5

back.  Officer Armstrong attempted to grab one of Emmett's arms, and Emmett asked, "What the fuck are you doing?"  (Id. at 2:03.)  Officer Armstrong responded, "When I tell you to stop, you stop! Roll over!"  (Id. at 2:04-2:09.)  Emmett giggled while looking at Officer Armstrong, but he did not roll over.  Officer Armstrong then said, "You're going to get TASE'd!" and immediately tased Emmett in the abdomen for a single, five-second taser cycle.  (Id. at 2:10.)  Approximately ten seconds had elapsed from the time Officer Armstrong tackled Emmett to the time he tased Emmett.

Emmett initiated this litigation in Wyoming state court, later removed to federal court, asserting two claims under 42 U.S.C. § 1983 against Officer Armstrong, in his individual capacity, and one claim against Chief Brenner, in his official capacity, alleging violations of his constitutional rights to be free from unreasonable seizures and excessive force.  Officer Armstrong asserted a defense of qualified immunity, and both defendants moved for summary judgment; after hearing arguments on the motions, the court granted both motions and entered judgment in favor of the defendants on all claims.

## II.  STANDARD OF REVIEW

"We review the district court's grant of summary judgment based on qualified immunity de novo."  Carabajal v. City of Cheyenne, 847 F.3d 1203, 1208 (10th Cir. 2017).  This de novo review is slightly different than our normal summary judgment review; when a defendant moves for summary judgment on the basis of qualified immunity, we first undertake a two-part analysis.  Pearson v. Callahan, 555 U.S. 223, 232

6

(2009). Addressing the questions in either order, we must determine (1) "whether the plaintiff has alleged facts to demonstrate a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time." Carabajal, 847 F.3d at 1208. "The burden of making this two-part showing lies with the plaintiff," and if the plaintiff fails to make a showing as to either question, the defendant is entitled to qualified immunity. Id. (internal citations omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Clark v. Edmunds, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting Nelson v. McMullen, 207 F.3d 1202, 1025 (10th Cir. 2000)). When determining whether the defendant is entitled to summary judgment, "we review the evidence in the light most favorable to the nonmoving party." Nelson, 207 F.3d at 1205 (quoting Romero v. Fay, 45 F.3d 1472, 1475 (10th Cir. 1995)).

### III. DISCUSSION

A.    **Fourth Amendment Claims Against Officer Armstrong**

The district court concluded that Officer Armstrong was entitled to qualified immunity because Emmett did not show a violation of his constitutional rights as to either his unreasonable seizure claim or his excessive force claim. We review these in turn.

> 1.  **Officer Armstrong's arrest of Emmett did not violate Emmett's constitutional right to be free from unreasonable seizures.**

7

The Fourth Amendment guides interactions between the police and citizens, and it requires that all government searches and seizures be reasonable. U.S. Const. amend. IV. For a seizure to be reasonable, an officer must have sufficient justification; for an arrest, the officer must have probable cause to arrest the person. Brinegar v. United States, 338 U.S. 160, 164 (1949). An officer has probable cause to arrest a person when the facts and circumstances surrounding the situation would lead a reasonably prudent officer to believe that the arrestee has committed a crime. Id. at 175–76. Whether probable cause exists is determined by looking at the totality of the circumstances, based on what an objective officer would have known in the situation. Id. at 175. This analysis does not look to the knowledge of the arrestee, nor does it look to the subjective knowledge of the officer in question. Whren v. United States, 517 U.S. 806, 813–14 (1996).

Emmett claims that Officer Armstrong did not have probable cause to arrest him for interfering with a peace officer. "In evaluating whether the events leading up to this arrest amount to probable cause, we ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause." Cortez v. McCauley, 478 F.3d 1108, 1116 (10th Cir. 2007).[2]

_____

[2] Officer Armstrong had reasonable suspicion to believe that Emmett had been fighting, also a misdemeanor, and thus his initial detention of Emmett prior to Emmett's flight comported with the requirements of Terry. See Terry v. Ohio, 392 U.S. 1 (1968) (permitting a brief investigative seizure on the basis of reasonable suspicion). To the extent that Emmett maintains any claims as to the propriety of the initial Terry stop based on Officer Armstrong's failure to identify himself, they fail for the reasons stated infra.

Greybull Municipal Ordinance 9.40.140 makes it "unlawful to resist any officer of the town of Greybull in making any lawful arrest, or impede or obstruct any such officer in performing any of his or her duties." Accordingly, whether Armstrong had probable cause to arrest Emmett turns not on whether Emmett subjectively knew that Armstrong was a peace officer, but whether an objectively reasonably officer could conclude, based on the facts and circumstances surrounding the situation, that (1) Emmett was impeding Officer Armstrong's duties and (2) Emmett knew that Officer Armstrong was a peace officer. See Corona v. Aguilar, 959 F.3d 1278, 1282–84.

No one disagrees that Emmett's flight impeded Officer Armstrong's duties; the real debate is whether a reasonable police office would believe that Emmett knew Officer Armstrong was a peace officer. And, the evidence, viewed in the light most favorable to Emmett, establishes that an objectively reasonable officer could conclude that Emmett knew Officer Armstrong was a peace officer.

Officer Armstrong arrived on scene in a marked police vehicle, wearing his uniform, with his car's lights on and flashing. There were multiple police vehicles in front of the Elks Club, all of which had their lights activated and flashing; there was also a crowd gathered outside, some of whom were engaging with the Greybull officers. Officer Armstrong can clearly be seen pointing to Emmett and another person as if directing them to a pickup truck, after which both men moved to the truck. The police lights filled the area, and both blue and white lights can be seen reflecting off the pickup truck. Minutes before Emmett ran from the truck, Officer

9

Armstrong had handcuffed and arrested Lancaster and placed him in the police car. And, when Officer Armstrong directed a man to return to the truck, the man complied with his authority. After undertaking police action in front of the crowd outside, it was reasonable for Officer Armstrong to believe that the crowd outside knew he was a peace officer. Hence, when Officer Armstrong instructed Emmett to stop, and Emmett did not comply, an objectively reasonable officer could conclude that probable cause existed to arrest Emmett for interfering with a peace officer.

To the extent that Emmett argues that arrests made by officers who do not verbally identify themselves as police officers are "objectively unreasonable" under the Fourth Amendment, the cases on which Emmett relies to support this argument actually militate against it. See Newell v. City of Salina, 276 F. Supp. 2d 1148, 1155 (D. Kan. 2003) (officers violated plaintiff's rights when they approached her at night, from behind, without identifying themselves and with no indication that they were officers); Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000) (holding that the plaintiff reasonably believed that the "three unidentified, gun-toting, blue-jean clad strangers yelling obscenities and ordering them to get on the ground" were armed robbers, not police officers); Mackinney v. Nielsen, 69 F.3d 1002, 1006 (9th Cir. 1995) (holding that plaintiff "probably did not realize that the order he was failing to obey came from the police" when it was yelled at him by an officer in an unmarked car); Atkinson v. City of Mountain View, 709 F.3d 1201, 1205 (8th Cir. 2013) (holding that plaintiff was not resisting arrest when the defendant officer "was not in uniform and had neither his gun nor his badge . . . [, and] never identified himself as

10

a police officer"); <u>Yates v. Cleveland</u>, 941 F.2d 444, 445, 447 (6th Cir. 1991) (holding that a plainclothes officer who fired his gun after entering a dark hallway in a private residence at 2:45 a.m. without identifying himself as police, wearing his police hat, or shining his flashlight was "more than merely negligent").

Each of these cases arose from a factual context in which there was no indication that the officers in question were, in fact, police officers. These cases do not stand for the proposition that officers must identify themselves; rather, they stand for the proposition that it must be objectively reasonable for an officer to believe the suspect knew he was an officer before requiring compliance. And, as explained above, applying that proposition to the facts of this case shows that there were more than sufficient indications from the surrounding circumstances that made it objectively reasonable for Officer Armstrong to believe that Emmett knew he was a police officer.[3]

Hence, although Officer Armstrong did not verbally identify himself as a police officer, because the totality of the circumstances show that it was objectively reasonable for Officer Armstrong to believe that Emmett knew he was a police officer, Emmett's arrest for interfering with a peace officer did not violate his Fourth Amendment rights. Because no constitutional right was violated, we need not determine whether that right was clearly established.[4] Thus, we AFFIRM the district

---

[3] It continues to be the best practice, of course, for officers to identify themselves as such when practicable.

[4] Because we do not reach the clearly established prong, we do not decide whether our knock-and-announce jurisprudence applies to the situation at bar.

11

court's grant of summary judgment to Officer Armstrong based on qualified immunity as to Emmett's unreasonable seizure claim.

### 2. Emmett sufficiently alleges that Officer Armstrong's use of his taser violated Emmett's clearly established Fourth Amendment rights.

Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendments. Estate of Booker v. Gomez, 745 F.3d 405, 418–19 (10th Cir. 2004). When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 394 (1989). Under the Fourth Amendment's "objective reasonableness" standard, "courts must 'careful[ly] balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Cavanaugh v. Woods Cross City, 625 F.3d 661, 664 (10th Cir. 2010) (quoting Graham, 490 U.S. at 396). "The ultimate question 'is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" Casey v. City of Fed. Heights, 509 F.3d 1278, 1281 (10th Cir. 2007) (quoting Graham, 490 U.S. at 397).

Our review of a Fourth Amendment excessive force claim looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment. See Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (quoting Graham, 490 U.S. at 396). Assessing the reasonableness of the force "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In addressing Emmett's excessive force claims, the district court considered Officer Armstrong's testimony, Emmett's testimony, and the video footage of the event, which was submitted in the record. See Scott, 550 U.S. at 381. Under Emmett's version of events, after Officer Armstrong tackled him and stood over him, Emmett was lying on his back, relaxed and laughing, and he was no longer attempting to flee or actively resisting. The video footage arguably could support either Emmett's version of events or Officer Armstrong's version of events. However, because this matter is presented on a summary judgment by Officer Armstrong, we have to view the video in the light most favorable to Emmett. At trial, the factfinder will have to decide what to believe; at summary judgment, however, we are required to believe Emmett if the record supports him. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009) (concluding that evidence is considered most favorably to the plaintiff in considering defendant's motion for summary judgment). In Scott, 550 U.S. at 380, the Supreme Court counseled that a video record of an event may be considered at the summary judgment stage only if it "blatantly contradict[s]" the other proper evidence at summary judgment. Here the

13

video footage does not "blatantly contradict" Emmett's version of the events, and in fact likely corroborates Emmett's version. Thus, on summary judgment the district court was required to accept Emmett's version, corroborated by a reasonable interpretation of the video corroborating Emmett's testimony.

Taking all the facts in the light most favorable to Emmett, therefore, it was not objectively reasonable for Officer Armstrong to deploy his taser. Graham, 490 U.S. at 397.

> ### i. Officer Armstrong violated Emmett's Fourth Amendment right to be free of excessive force when he engaged his taser without giving Emmett a sufficient warning and after Emmett had ceased actively resisting.

Emmett asserts that Officer Armstrong used excessive force against him when Officer Armstrong tased him without sufficient warning and after he had ceased actively resisting. Applying the Graham factors to the circumstances as they existed when Officer Armstrong deployed his taser, we conclude that Officer Armstrong's use of the taser was objectively unreasonable.

As to the first Graham factor, the severity of the crime, interfering with a peace officer is a non-severe misdemeanor, punishable by a fine of up to $750 and no possibility of jail time. See Greybull, Wyo., Muni. Code § 9.40.150. This crime warrants only minimal use of force; hence, the first factor strongly weighs in Emmett's favor. See Lee v. Tucker, 904 F.3d 1145, 1149 (10th Cir. 2018) ("[W]e have held that the first Graham factor may weigh against the use of significant force if the crime at issue is a misdemeanor.").

14

"The second Graham factor, whether the suspect posed an immediate threat to the safety of the officers or others is undoubtedly the most important." Pauly v. White, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (internal citations and quotations omitted) (quoting Graham, 490 U.S. at 396). We must look at "whether the officers [or others] were in danger at the precise moment that they used force." Id. at 1219.

The district court relied heavily on Emmett's run from Officer Armstrong when addressing this factor, noting that Emmett could have been attempting to reengage with whomever he had been fighting previously. However, when Officer Armstrong tackled Emmett, he had effectively neutralized any safety concerns arising from Emmett's flight. Thus, the only "immediate threat" to safety was that arising from Emmett himself. And, under Emmett's version of events, he was lying on his back on the ground, visibly relaxed, laughing, and had ceased any active resistance. Moreover, Officer Armstrong's chase placed the two away from any bystanders, and there were no allegations that any weapons were involved. Under these circumstances, Emmett posed a minimal safety threat, and the second Graham factor also weighs substantially against the use of significant force.

The final Graham factor asks whether the suspect was actively resisting arrest or fleeing. As addressed above, any attempt to flee had been effectively subverted by Officer Armstrong's tackling Emmett. And, looking at the events leading up to Officer Armstrong's tackling Emmett, even Emmett's actual flight was rather halfhearted. He initially walked away from the pickup truck, and he did not begin running until Officer Armstrong began chasing him. This type of flight would

15

certainly warrant Officer Armstrong's tackling Emmet; indeed, his tackling Emmett was sufficient to end Emmett's flight and active resistance. But it was not until approximately ten seconds later that Officer Armstrong tased Emmett. In the precise moment that Officer Armstrong tased Emmett, Emmett was no longer fleeing. Although Emmett did not readily comply with Officer Armstrong's order to roll over, he was not actively resisting at that point. Thus, the third Graham factor also weighs against the use of significant force.

All three Graham factors support only a minimal use of force. Also weighing against the objective reasonableness of the force used was Officer Armstrong's taser warning. Officer Armstrong engaged his taser before he had completed his warning, which gave Emmett no time to modify his behavior and comply with Officer Armstrong's requests. And, once again, this was approximately ten seconds after Officer Armstrong had tackled Emmett and Emmett had ceased actively resisting. Though we make "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," Kisela, 138 S. Ct. at 1152, we rely on police officers to recognize how the circumstances are evolving and to adjust their actions to avoid unnecessary escalations of force. See Fancher v. Barrientos, 723 F.3d 1191, 1201 (10th Cir. 2013) (explaining that the officer had "enough time to recognize and react to the changed circumstances and cease firing his gun"); see also Cavanaugh, 625 F.3d at 666 ("It is not objectively reasonable to ignore specific facts as they develop (which contradict the need for this amount of force).").

16

Thus, under Emmett's version of events, Officer Armstrong's use of his taser was objectively unreasonable, and Emmett has sufficiently alleged a violation of his right to be free from excessive force under the Fourth Amendment.

### ii. Emmett's right not to be tased without sufficient warning and after he had ceased resisting was clearly established in October 2013.

Having determined that Emmett sufficiently established a violation of a constitutional right, the next question is whether that right was clearly established at the time the conduct occurred. "To be clearly established, ordinarily there must be prior Supreme Court or Tenth Circuit precedent, 'or the weight of authority from other circuits,' that would have put an objective officer in [defendant]'s position on notice that he was violating [plaintiff]'s Fourth Amendment rights." Estate of Ceballos v. Husk, 919 F.3d 1204, 1213 (10th Cir. 2019) (quoting Carabajal, 847 F.3d at 1210). "[T]he fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear which uses of force are unreasonable." Casey, 509 F.3d at 1284. "Nonetheless, even in the Fourth Amendment context, there need not be a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate.'" McCowan v. Morales, 945 F.3d 1276, 1285 (10th Cir. 2019) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018)); see also McCoy v. Meyers, 887 F.3d 1034, 1052–53 (10th Cir. 2018) (looking at the "decisive factual circumstances" and relying on cases that "are not factually identical," but "are factually analogous"). Here, then, the relevant inquiry is whether, in October of 2013, there were applicable Tenth Circuit cases putting Officer Armstrong on notice that

17

using a taser without providing an adequate warning against a misdemeanant who had ceased actively resisting was unconstitutional. We conclude that there was Tenth Circuit precedent—Casey and Cavanaugh—putting Officer Armstrong on notice that his use of force was unreasonable.

In 2007, we addressed the use of a taser without warning on a nonviolent misdemeanant. Casey, 509 F.3d at 1286. In Casey, the plaintiff was arrested by city police officers after he had taken his court file with him from the courthouse when he went to his car to get money to pay his court fees. Id. at 1280–81. In the course of that arrest, the plaintiff was grabbed, tackle, tased, and beaten. Id. at 1280. Just as Emmett did, the plaintiff here initially struggled with the officer, and as the officer was tackling him, asked what he was doing. Id. Another officer arrived at that time, and she tased the plaintiff "immediately and without warning" upon arriving at the scene. Id. at 1285. We concluded that it was "excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." Id. at 1286.

In so concluding, we stated that "[t]he absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling." Id. at 1285. When an officer fails to provide a warning—i.e., a verbal command to either comply with her directions or be tased—she gives the suspect "no opportunity to comply with her wishes before firing her Taser." Id. And, as the

18

purpose of a warning is to obtain compliance,[5] a warning without an opportunity to comply is no warning at all.

Casey also emphasized the plaintiff's lack of active resistance, distinguishing Hinton v. City of Elwood, 997 F.2d 774 (10th Cir. 1993), in which we found an officer's taser use justified when the suspect was actively resisting by kicking and biting the officer (who had provided the suspect with sufficient warning). Id. at 776–77, 781. Even though the Casey plaintiff initially struggled with the officer—just as Emmett did here—Casey differentiated that from the Hinton plaintiff's active resistance through kicking and biting. Casey concluded that "[n]either of these factors—the warning or the violence of the victim—[was] present [t]here to justify the use of the Taser." Casey, 509 F.3d at 1286.

In sum, Casey clearly established that use of a taser without adequate warning on a nonviolent misdemeanant who is not actively resisting is unreasonable.

We reiterated this holding three years later, in Cavanaugh, when we relied on Casey to deny qualified immunity to an officer who used his taser "on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." 625 F.3d at 666–67. In Cavanaugh, officers responded to a husband's call requesting assistance finding his wife, "who had stormed out of the house after a domestic dispute." Id. at 662. The husband informed officers that his wife had

_____

[5] Officer Armstrong's police practices expert agrees that the purpose of an officer giving a suspect a warning that he or she is going to be tased is to obtain compliance from the suspect.

19

been drinking, had taken pain medication, and left home with a kitchen knife.  Id. at 663.

Shortly thereafter, one of the officers found the wife approaching the house; the officer

then tased the wife without warning, even though he saw no knife in her hands.  Id.

Relying on Casey, we held that "it was clearly established on December 8, 2006 that [an

officer] could not use his Taser on a nonviolent misdemeanant who did not pose a threat

and was not resisting or evading arrest without first giving a warning."  Id. at 667.

We had no occasion to address the sufficiency of the warning in Cavanaugh, as the

officer never provided one.  We did, however, still require a warning even though the

wife in Cavanaugh presented potentially a more significant safety threat than the plaintiff

in Casey.  The officers had yet to engage with the wife, but they had been told that she

was likely angry, possibly armed, and under the influence of multiple substances.  Thus,

while the wife was not actively resisting, the uncertainty of the situation posed a safety

threat.  And, still, we required a warning before using a taser.

Although Emmett did run from Officer Armstrong, prior to doing so Emmett had

been slowly walking away from where had been standing at the back of the truck, calmly

speaking to another man.  After Officer Armstrong's tackle quelled Emmett's flight,

Emmett was laying on his back, not actively resisting, for approximately ten seconds

before Officer Armstrong tased him.  And, unlike in Cavanaugh, there was no evidence

that Emmett was armed.  Thus, Emmett's situation posed even less of safety threat than

the uncertainty of the situation in Cavanaugh posed, and we required a pre-taser warning

there.

20

Thus, Cavanaugh reiterated the holding in Casey that it was unreasonable for an officer to "use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." Cavanaugh, 625 F.3d at 667.

Finally, though not controlling because it involved events occurring after the events here, our holding in Lee v. Tucker, 904 F.3d 1145 (10th Cir. 2018), is in line with our holding here. In Lee, four officers were dispatched to a domestic dispute arising after a couple arrived home following a barbecue. Id. at 1147. The officers separated the couple to interview them, during which time the husband was uncooperative. Id. Two of the officers stepped outside to discuss what they had learned, while the other two remained in the living room with the couple. Id. The husband moved to go to the kitchen, and the officer moved to stop him (concerned that there were knives in the kitchen), and a struggle broke out. Id. at 1148. The officers from outside came in and used physical force to retrain the husband; at that point, another officer used his taser on the husband without warning. Id.

Just like in Casey, Lee relied on the fact that the warning gave the subdued person no opportunity to comply before being tased when it held that such conduct violated the arrested party's Fourth Amendment rights. Id. at 1150 n.1 (10th Cir. 2018). Further, like in Cavanaugh (and unlike the situation in our case), the situation in Lee raised uncertainty about the presence of a weapon. Thus, although addressing events that occurred after the events here, Lee utilized the same clearly established law to do so.

21

Therefore, in October 2013, Officer Armstrong was on notice that using a taser without providing an adequate warning against a misdemeanant who had ceased actively resisting was unconstitutional. Because Emmett has sufficiently alleged a violation of a clearly established right, we REVERSE the district court's grant of summary judgment to Officer Armstrong.

## B. Monell Liability Claim Against Chief Brenner

Emmett also brought a § 1983 claim against Police Chief Bill Brenner, in his official capacity, alleging a failure-to-supervise. See Monell v. N.Y. Dept. of Social Servs., 436 U.S. 658, 690–95 (1978) (establishing municipality liability under § 1983). Under Monell, a § 1983 claim against a municipal officer in his or her official capacity is a claim against the city itself. Id. "[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation—i.e., the first step of the qualified immunity analysis—a finding of qualified immunity . . . preclude[s] the imposition of municipal liability." Jiron, 392 F.3d at 419 n.8. Thus, after finding that Armstrong committed no constitutional violation, the district court granted summary judgment to Chief Brenner. However, as we now reverse the district court's finding that no excessive force was used, we must also "reverse its logically dependent grant of summary judgment" for Chief Brenner. Casey, 509 F.3d at 1287.

We decline Chief Brenner's invitation to affirm this claim on the merits, and we find his assertion that Emmett waived this claim by not arguing it on appeal unavailing. The district court correctly determined that a claim for municipal

22

liability must fall in the absence of a constitutional violation; hence, there was no error from which Emmett could appeal. Emmett did, however, appeal the district court's order finding there was no underlying constitutional violation, which was the sole rationale supporting the grant of summary judgment in favor of Chief Brenner. Thus, we REVERSE the district court's grant of summary judgment to Chief Brenner to the extent that it related to Officer Armstrong's use of force.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Officer Armstrong as to Emmett's § 1983 claim for unreasonable seizure. We REVERSE the district court's grant of summary judgment to Officer Armstrong as to Emmett's § 1983 claim for excessive force. We REVERSE the district court's grant of summary judgment to Chief Brenner as to Emmett's § 1983 claim for failure-to-train to the extent that it relates to Officer Armstrong's use of force. We REMAND the case for further proceedings consistent with this opinion.