**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 29, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GREGORY HEARD,

    Plaintiff - Appellee,

v.

GREG DULAYEV, individually; CITY
AND COUNTY OF DENVER, a
municipality,

    Defendants - Appellants.

No. 19-1461

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-01936-REB)**
_____

Melanie Lewis, Assistant City Attorney (Michele A. Horn, Assistant City Attorney, with
her on the briefs), Denver Colorado, for Defendants-Appellants.

Erica T. Grossman, Holland Holland Edwards & Grossman, Denver, Colorado, for
Plaintiff-Appellant.
_____

Before **MATHESON**, **McHUGH**, and **EID**, Circuit Judges.
_____

**EID**, Circuit Judge.
_____

In a two-count complaint, Gregory Heard sued Denver Police Officer Greg

Dulayev and the City and County of Denver ("the City") pursuant to 42 U.S.C.

§ 1983 (collectively, "the defendants").  Heard claimed Dulayev used excessive force

in violation of the Fourth Amendment during an event that took place on June 3, 2016. Heard further claimed this alleged constitutional violation was a foreseeable consequence of the City's alleged failure to train, supervise, and discipline its employees, including Dulayev, with respect to the use of force. Dulayev and the City moved for summary judgment on Heard's two claims. The district court denied the defendants' motion, and the defendants now appeal that order. Additionally, Heard has moved to dismiss the defendants' appeal for lack of jurisdiction.

Finding jurisdiction over part of Dulayev's appeal, we deny in part Heard's motion to dismiss. As to the substance of the appeal, we hold that Heard has failed to show Dulayev's use of the Taser violated a constitutional right clearly established at the time where Dulayev had ordered Heard to crawl, threatened to use his Taser, and repeatedly ordered Heard to stop, but where Heard still continued to approach Dulayev. We thus reverse the district court's denial of summary judgment as to Dulayev, and remand with instructions to grant Dulayev qualified immunity and enter judgment in Dulayev's favor. However, because we resolve the claim against Dulayev by finding that it was not clearly established that his conduct amounted to a constitutional violation, we decline to exercise pendent jurisdiction over the City's appeal. We thus grant Heard's motion to dismiss as it relates to the City's appeal, and remand for further proceedings consistent with this opinion.

## I.

## A.

On June 3, 2016, Heard was involved in a fight with another man behind some bushes off to the side of a street in Denver, Colorado.[1] When Officer Dulayev and Officer Adrian Enriquez arrived on scene, the other man involved in the fight came out from behind the bushes at Enriquez's orders. Heard remained sitting behind the bushes next to a fence.

Dulayev approached the bushes and ordered Heard to put his "hands up!" App'x Vol. I at 80. Heard told Dulayev his hands were up. Heard also waved his hands out from behind the bushes so Dulayev could see that he was not holding anything. With his Taser drawn, Dulayev then ordered Heard to crawl out of the bushes: "Crawl out. Crawl out on your hands and knees or I'll f—king tase you." *Id.* at 80–81. Heard replied, "Don't tase me, man." *Id.* at 81.

Heard began to emerge from the bushes on his hands and knees. But, as he emerged, Heard rose to his feet and took a few steps toward Dulayev. Dulayev ordered Heard to "Turn around!" and to "Stop right there! Stop!" *Id.* However, as Dulayev made these commands, Heard continued to approach Dulayev.

---

[1] We take the following facts from the district court's findings initially set out in its order denying the defendants' motion to dismiss and later incorporated by reference in its order denying the defendants' motion for summary judgment.

At this point, Dulayev deployed his Taser, striking Heard in the abdomen. Heard fell to his knees. *Id.* "Dulayev then jumped on Mr. Heard and aggressively shoved his face into the dirt."[2] *Id.* The officers then placed Heard in handcuffs.

Throughout these events, according to the district court's findings, Heard did not "appear agitated or aggressive toward Officer Dulayev" and did not "demonstrate any . . . physical resistance or try to escape from Officer Dulayev." *Id.* Instead, Heard's "facial expression and body movements . . . were non-threatening." *Id.* For instance, Heard's "arms were at his sides," and the district court thought Heard's "body language clearly indicated he was in no way trying to fight or attack the police officers." *Id.* at 82. The district court also found "Heard was never given a reasonable opportunity to surrender peacefully and comply with Officer Dulayev's bang-bang commands."[3] *Id.* at 81.

**B.**

Heard filed this suit against Dulayev and the City in the federal district court in Colorado on August 10, 2017. Heard claimed that Dulayev used excessive force in violation of the Fourth Amendment and that this violation was a foreseeable consequence of the City's failure to train, supervise, and discipline its employees.

---

[2] Although the district court found that Dulayev shoved Heard's face, as we explain below, this finding is blatantly contradicted by the record. *See infra* at 9–10 (explaining that body camera video shows Enriquez is the one shoving Heard's face).

[3] This finding is also blatantly contradicted by the record. *See infra* at 9 (stating that before Dulayev's "bang-bang" commands, Dulayev had taken out his Taser, threatened to use it on Heard, and Heard had already risen to his feet and taken about several steps toward Dulayev).

On October 23, 2017, the defendants moved to dismiss Heard's complaint.  The defendants argued Dulayev was entitled to qualified immunity because Dulayev's alleged actions did not amount to a constitutional violation under clearly established law.  The defendants also argued that the City should be dismissed as a defendant because Heard failed to allege "a Denver custom, policy or practice that was the moving force for a constitutional violation." *Id.* at 45.

The district court denied the defendants' motion to dismiss, concluding that "the allegations in the complaint [were] sufficient to state a valid Fourth Amendment claim against Officer Dulayev." *Id.* at 89.  Specifically, the court found that "Tenth Circuit decisions . . . establish that use of a taser . . . . constitutes excessive force when the suspect is not armed, does not appear to be reaching for a weapon, is not fleeing, has made no verbal threats, [and] has not made physical movements [or gestures] that reasonably can been seen as threatening." *Id.* at 92.  The court explained: "disobey[ing] some orders of the officer does not, by itself, justify a potent use of physical force . . . when there exists a real dispute about whether the rapidity of the orders gave the suspect a reasonable time to hear, process, and respond." *Id.*  As to Heard's claim against the City, the court similarly held that the allegations sufficiently stated a plausible claim to relief on the face of the complaint.

Following the district court's order, Heard amended his complaint and the parties conducted discovery.  The defendants then filed a motion for summary judgment, making arguments similar to those in their motion to dismiss.  On

5

December 4, 2019, the court rejected these arguments for similar reasons as before and thus denied the motion.

On December 5, 2019, the defendants filed a notice of appeal of the district court's order denying summary judgment. On the same day, Heard filed a motion in the district court asking it to certify the defendants' appeal as frivolous for lack of jurisdiction. The district court denied the motion. On December 16, 2019, in this court, Heard filed a motion to dismiss the defendants' appeal, similarly arguing that this court lacks jurisdiction.

## II.

We first address the jurisdictional element in this case as it pertains to both Heard's motion and to the defendants' appeal itself. Heard characterizes the defendants' appeal as inherently fact-based, and thus, improper for our consideration. *See* Aple. Br. at 2. We disagree with this characterization because the parties accept a majority of the district court's factual findings, and the few disputed facts are proper for consideration because those facts, as found by the district court, are blatantly contradicted by the record.

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We thus "may review . . . whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation" and "whether that law was clearly established at the time of the alleged

6

violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 409 (10th Cir. 2014). On the other hand, we generally "lack[] jurisdiction at this stage to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020) (citation and quotation marks omitted). As a result, we "usually must take [a district court's factual determinations] as true." *Ralston v. Cannon*, 884 F.3d 1060, 1066–67 (10th Cir. 2018) (citation omitted).

But, in limited circumstances, we do "have jurisdiction to review the factual record de novo." *Sawyers*, 962 F.3d at 1281 n.10. We may do so, for instance, if "the district court fails to make its factual assumptions explicit," requiring us to "undertake a cumbersome review of the record to ferret out facts that the district court likely assumed." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008) (citation and internal quotation marks omitted). We may also do so if "the version of events the district court holds a reasonable jury could credit is blatantly contradicted by the record." *Sawyers*, 962 F.3d at 1281 n.10 (citation and internal quotation marks omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007).

As part of their argument on appeal, the defendants urge a "cumbersome review" of the record because "the district court did not make factual findings" at summary judgment. Aplt. Br. at 11; Reply Br. at 2–4. But such an argument alone does not prevent us from considering the defendants' appeal. *See Fogarty*, 523 F.3d at 1154. In any event, the defendants accept the majority of these incorporated

7

findings as true for the appeal, outside of two disputed facts. *See* Aplt. Br. at 12 (noting their "statements of the facts . . . derive from the facts set forth in the district court's order on the motion to dismiss"); *see also* Aple. Br. at 9–11 (quoting the statement of facts set forth in the order on the motion to dismiss).[4]

First, the defendants' argument on appeal necessarily relies on the premise that the district court's finding—that "Heard was *never* given a reasonable opportunity to surrender peacefully and comply with Officer Dulayev's bang-bang commands"—is blatantly contradicted by the record. App'x Vol. I at 81 (emphasis added); *see* Aplt. Br. at 19–20. The record shows that even before the "bang-bang" commands, Dulayev had taken out his Taser and threatened to use it if Heard did not "[c]rawl out on [his] hands and knees." *Id.* at 80–81. Heard's response, "Don't tase me," shows he was cognizant of the Taser. *Id.* at 81. Yet, after momentarily crawling, Heard "rose to his feet," and "took about three steps in the direction of Officer Dulayev." *Id.* As Heard began to take these steps, Dulayev ordered Heard to "Turn around!" and to "Stop right there! Stop!" *Id.* But Heard continued to take steps towards Dulayev. At this point, Heard had already gone against Dulayev's command to crawl and he knew Dulayev stood there ready with a Taser. Even after this initial command, Dulayev gave Heard additional time and warning to stop. Thus, the record clearly shows that Heard had an opportunity to surrender before he took those

---

[4] While Heard argues that the defendants also mischaracterize other facts found by the district court, such as the pace Heard took as he stepped toward Dulayev and Heard's active resistance, we do not rely upon those particular characterizations. *See* Aple. Br. at 19–20.

additional steps in the direction of Dulayev.  Because this finding is blatantly

contradicted by the record, we need not accept it in our analysis.  *See Sawyers*, 962

F.3d at 1281 n.10.

Second, the defendants also claim that the court's finding that, as Heard was

being handcuffed, Dulayev "aggressively shoved [Heard's] face into the dirt" after

jumping on him is blatantly contradicted by the record.  App'x Vol. I at 83; *see* Aplt.

Br. at 23–24.  Heard does not appear to contest this argument.[5]  *See* Aple. Br. at 24

n.10 ("[T]he fact that it was Enriquez, not Dulayev, who pushed his face farther into

the ground does not exonerate Dulayev's unconstitutional conduct.").  But even if

Heard did not abandon this particular argument, the video evidence is clear that it

was Enriquez who shoved Heard's face into the dirt, while Dulayev restrained

Heard's arms.  [*See* App'x Vol. I at 221, at 01:25 – 01:34.]  Thus, because this

finding is "blatantly contradicted" by the record, we need not accept it in our

analysis.  *See Sawyers*, 962 F.3d at 1281 n.10; *Scott*, 550 U.S. at 380.

Now, as we explain in more detail below, considering whether the law was

clearly established under the facts that the district court did find—and which Dulayev

accepts—leaves us with a purely legal question appropriate under our limited

jurisdiction: whether a police officer's use of a Taser is justified where, despite

---

[5] Because Heard does not present an argument regarding this aspect of his claim, Heard has abandoned it.  *See Stender v. Archstone-Smith Operating Tr.*, 910 F.3d 1107, 1117 (10th Cir. 2018) (treating claims not mentioned on appeal as abandoned).

repeated warnings and orders to stop, an assault suspect continues to step toward that officer at close proximity.

## III.

### A.

Subject to the limits of our jurisdiction, we "review the district court's denial of a summary judgment motion asserting qualified immunity de novo." *Fancher v. Barrientos*, 723 F.3d 1191, 1199 (10th Cir. 2013). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

Here, the material facts relevant to the clearly established law inquiry were laid out by the district court. The parties do not dispute that Heard rose to his feet despite Dulayev's order to crawl out on his hands and knees, and that Heard

continued to approach Dulayev despite orders to "Turn around!" and "Stop right there! Stop!"  *See* Aplt. Br. at 7; Aple. Br. at 10.  Still, the defendants dispute two particular findings, as described above.  But, as to these two findings, "[Heard]'s version of events is so utterly discredited by the record that no reasonable jury could have believed him."  *Scott*, 550 U.S. at 380–81.  Thus, we do not rely on those two findings. Considering the undisputed material facts, in addition to our findings described above, we are left with the question of whether Dulayev is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

## B.

"When a § 1983 defendant raises the qualified immunity defense, the burden shifts to the plaintiff" to "show (1) facts that demonstrate the [defendant] violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct."  *Sawyers*, 962 F.3d at 1282.  The court may address either prong of the inquiry first and need not address both if one is dispositive.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 243–45 (2009).  In this case, we begin and end our analysis with the second prong.

A constitutional violation is clearly established if "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation and internal quotation marks omitted).  Under "[t]his demanding standard," the alleged violation "must have a sufficiently clear foundation in then-existing precedent"— either "controlling authority or a robust consensus of cases of persuasive authority."

11

*Id.* at 589–90 (citation and internal quotation marks omitted).  The clearly-established-law prong, moreover, "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstance before him."  *Id.* at 590.  Accordingly, the plaintiff must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  *Id.* (citation and internal quotation marks omitted).  The case need not be "directly on point," but the "existing precedent must place the lawfulness of the [defendant's conduct] beyond debate."  *Id.* (citation and internal quotation marks omitted).[6]

## C.

In this case, Heard has failed to identify a sufficiently clear then-existing precedent that prohibited Dulayev from using a Taser where Heard rose to his feet and continued to take steps toward Dulayev, even after Dulayev had threatened the use of the Taser and repeatedly ordered Heard to stop.  Heard principally relies on four Tenth Circuit cases to argue that Dulayev's actions amounted to a constitutional violation under clearly established law.  But these cases do not establish a "legal principle clearly prohibit[ing] [Dulayev's] conduct in the particular circumstances before him."  *Wesby*, 138 S. Ct. at 590.

---

[6] "[T]here can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."  *Wesby*, 138 S. Ct. at 591 (citation omitted); *see Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021) (finding it "obviously egregious" where a prosecutor "provid[ed] a medical examiner materially false information that influence[d] his expert opinion as to whether a homicide occurred and then put . . . that medical examiner on the stand to testify based on that false information").  Heard does not argue that this is such a case, nor do we think it is.

In three of these cases, we found the officer's use of a Taser to be an unconstitutional use of force pursuant to clearly established law. First, in *Casey v. City of Federal Heights*, the plaintiff left a courthouse to retrieve money from his car to pay a traffic ticket. 509 F.3d 1278, 1279–80 (10th Cir. 2007). In doing so, he took his court file outside the courthouse—"which may have been a misdemeanor under Colorado law." *Id.* at 1280. After retrieving his money, he walked back toward the courthouse but was stopped by a police officer asking for his file. *Id.* Despite the fact the plaintiff initially held out the court file, allowing the officer to retrieve it, the officer, "[w]ithout further explanation" or warning, twisted the plaintiff's arm and jumped on the plaintiff as the plaintiff tried to continue on his way. *Id.* A "struggle" followed, but the plaintiff "was not fighting back." *Id.* at 1285. We found the first officer's use of force to be a constitutional violation because the plaintiff was "a nonviolent misdemeanant who was neither dangerous nor fleeing" and the officer failed to give the plaintiff "any indication that he was, or would soon be, under arrest." *Id.* at 1282–83. In the meantime, a second officer arrived on scene and "immediately and without warning" shot the plaintiff with her Taser. *Id.* at 1280, 1286. When the second officer discharged her Taser, in fact, "one witness testified that" . . . "she could not have known what was going on." *Id.* at 1285. Focusing on the fact that the second officer "use[d] [her] Taser immediately and without warning against a misdemeanant like" the plaintiff, we also found the second officer's use of force a constitutional violation under clearly established law. *Id.* at 1286.

Second, in *Cavanaugh v. Woods Cross City*, officers "responded to a non-emergency call placed by" the plaintiff's husband to "help find[] his wife, [the plaintiff], who had stormed out of the house after a domestic dispute." 625 F.3d 661, 662 (10th Cir. 2010). When officers arrived at the plaintiff's house, the husband told them "he and [the plaintiff] had a fight, during which [the plaintiff] attempted to put him in a closet; that [the plaintiff] had consumed alcohol and pain medication; and that [the plaintiff] had left the home with a kitchen knife." *Id.* at 662–63; *see also id.* at 663 (noting that the plaintiff "later plead guilty to assault-domestic violence and intoxication"). Eventually, however, the plaintiff walked back to her home, with nothing in her hands as they "were clearly visible by her side," and got "within several feet" of one of the officers who had "exited the house and began walking down the driveway." *Id.* at 663. Walking quickly, she veered away from the officer "towards the front door, cutting across the lawn," but "was neither actively resisting nor fleeing arrest." *Id.* at 663, 665. In fact, the officer "gave her no verbal commands and she had little reason to believe that the officers were responding to a crime." *Id.* at 665. The officer then "gently placed his flashlight and clipboard on the ground and followed her," "removed his Taser, and discharged the Taser into [the plaintiff's] back without warning." *Id.* at 663. We found this use of force to be a constitutional violation under clearly established law. *Id.* at 666–67. Specifically, we relied on the circumstances in *Casey*, concluding "it was clearly established" that an officer "could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *Id.*

14

Third, in *Emmett v. Armstrong*, we again relied on *Casey*, as well as *Cavanaugh*, to find the officer's use of a Taser was a constitutional violation under clearly established law. 973 F.3d 1127, 1137–39 (10th Cir. 2020). There, officers responded to a call that the plaintiff was involved in a fight. *Id.* at 1131. After seeing the plaintiff walking away, one of the officers yelled at the plaintiff to "Come here." *Id.* The plaintiff continued to walk away and eventually started to run. *See id.* The officer chased the plaintiff and tackled him to the ground. *See id.* But once subdued on the ground, the plaintiff was on his back, "visibly relaxed," and "made no further movements indicating an attempt to run or fight back." *Id.* The officer ordered the plaintiff to "Roll over!" *Id.* Rather than rolling over, the plaintiff just "giggled while looking at [the officer]." *Id.* The officer "then said, 'You're going to get TASE'd!' and immediately tased Emmett in the abdomen." *Id.* We found this warning inadequate under the circumstances and held that the officer "was on notice that using a taser without providing an adequate warning against a misdemeanant who had ceased actively resisting was unconstitutional."[7] *Id.* at 1139.

These cases contain material differences from the facts here, and those differences prevent us from concluding the law was clearly established that the use of a Taser is not justified where an assault suspect continues to step toward that officer at close proximity despite an officer's repeated warnings and orders to stop. Initially,

---

[7] Because *Emmett* was decided on September 1, 2020, we cannot view it as establishing clearly applicable law at the time of the incident at issue here, which occurred on June 3, 2016. *See Knopf v. Williams*, 884 F.3d 939, 947 (10th Cir. 2018).

we note that unlike the officers in *Casey* and *Cavanaugh*, Dulayev did issue a warning that he would discharge his Taser if Heard did not "Crawl out on [his] hands and knees." App'x Vol. I at 80–81. And unlike the warning and immediate tasing in *Emmett*—which we deemed inadequate—Heard was aware of this warning as he responded, "Don't tase me, man." *Id.* at 81. In fact, this exchange happened before Heard came out from behind the bushes, rose to his feet, and approached Dulayev. *See id.* at 80–81.

Moreover, Heard's actions were quite unlike the plaintiffs' in *Casey*, *Cavanaugh*, and *Emmett*. Heard did not follow Dulayev's orders—he rose to his feet after being told to crawl and he continued to walk toward Dulayev after being told to stop. The plaintiffs in *Casey* and *Cavanaugh*, on the other hand, did not resist. While the plaintiff in *Emmett* did not roll over, but instead giggled, his nonaction is far different than Heard's continued approach toward Dulayev. Indeed, Heard's approach is no minor detail, given that the Supreme Court has mandated that our "calculus of reasonableness [of an officer's use of force] must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). In addition, our analysis must take into consideration "whether the [plaintiff] pose[d] an immediate threat to the safety of the officers." *Id.* at 396. A giggle and nonaction is much less threatening than a continued approach in close proximity. *Id.*

16

Additionally, the district court findings that Heard's body language was non-aggressive and non-threatening alone are not sufficient to equate this case to the circumstances faced by the officers in *Casey*, *Cavanaugh*, and *Emmett*. "While there does not have to be 'a case directly on point,'" the surrounding caselaw must "clearly prohibit the officer's conduct in the particular circumstances"—with "a high 'degree of specificity'"—"before him." *Wesby*, 138 S. Ct. at 590 (citations omitted). Moreover, the Supreme Court has "stressed" that this is "especially important in the Fourth Amendment context." *Id.* (citation and internal quotation marks omitted). Thus, Heard's first three cases fail to meet this "demanding standard," as Dulayev's warning and Heard's actions materially distinguish the circumstances of this case from those three. *Id.* at 589–90.

Heard's fourth case likewise fails to line up with the facts here. In *Morris v. Noe*, officers arrived at the scene of a domestic disturbance where multiple people were yelling at each other, a vehicle "showed signs of significant body damage," "[g]lass lay on the ground," and "[a] pile of clothing was smoldering." 672 F.3d 1185, 1189 (10th Cir. 2012). When "[t]he situation was 'calm and under control,'" the plaintiff, a relative of one of the people at the scene, showed up. *Id.* at 1190. After the plaintiff verbally confronted another person at the scene, that person approached the plaintiff. *Id.* In response, the plaintiff "put his hands up and started backing toward the police officers," and two of the officers "lunge[d] towards [him] and put their hands on his shoulders, twisted him around and ran him into the bushes . . . throwing him to the ground." *Id.* But in contrast to the facts here where Dulayev

17

gave several warnings, the officers gave the plaintiff no warning that they were going to use force against him, nor any orders to calm down or to stop moving. *Id.* at 1196. To be clear, the plaintiff did go in the direction of the officers. But unlike Heard, he had his back to them, backing away from a totally different person. *Id.* at 1190.

In addition to his primary cases, Heard relies on a Sixth Circuit case, *Hagans*, that described *Cavanaugh* and *Casey* in two short parentheticals. *Hagans v. Franklin Cty. Sheriff's Off.*, 695 F.3d 505, 510 (6th Cir. 2012). *Hagans* cited these two cases to support a general proposition that "active resistance . . . marks the line between reasonable and unreasonable tasing in other circuits," which was part of a larger conclusion that the law was not "clearly established . . . that using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force." *Id.* at 509–10. But, as explained above, *Cavanaugh* and *Casey* fail to support Heard's position that Dulayev's actions constituted constitutional violations under clearly settled law. Additionally, we are unconvinced that an out-of-circuit case can shoulder Heard's burden where it makes a broad claim about our caselaw inside a complex analysis that found that the law was not clearly established.[8] *See Wesby*, 138 S. Ct. at 589–90 (finding that existing law must place the constitutionality of the conduct "beyond debate," and must clearly prohibit the

---

[8] *Hagans* involved a more extended standoff and a particularly more aggressive scuffle between the suspect and the officers. *See id.* at 507, 510–11 ("[A] shirtless Hagans came running toward [the officer]," "Hagans bolted for the backyard, and [the officer] gave chase," "Hagans was out of control," officers "wrestle[d] him to the pavement," "continued forcefully to resist arrest," and "refused to be handcuffed," but did not "land any kicks or punches.").

18

officer's conduct in the particular circumstances before him with a "high degree of specificity") (internal quotation marks and citations omitted); *Morris*, 672 F.3d at 1196 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (quotations omitted).

Finally, Heard cites to two unpublished Sixth Circuit cases. These cases, however, are insufficient to show a legal principle has a "sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589–90. Indeed, we have previously rejected attempts to rely on unpublished cases even within our circuit. *Knopf v. Williams*, 884 F.3d 939, 947 (10th Cir. 2018). In any event, the circumstances of those cases are unlike those here.

In the first case, the plaintiff got into a truck and called to report a scuffle at a wedding reception between partygoers and other police that were already on the scene. *Kijowski v. City of Niles*, 372 F. App'x 595, 595–97 (6th Cir. 2010) (unpublished). But "[a]fter briefly conversing with [the plaintiff], the dispatcher contacted officers on scene," and those officers "approached the truck," and eventually "dragged [him] [out], threw him to the ground, shocked him twice with a Taser, and kicked him repeatedly." *Id.* at 595–96. In the second case, officers tased the plaintiff despite the fact that the plaintiff "surrendered, putting herself at the officers' mercy by falling to her knees and placing her hands above her head." *Thomas v. Plummer*, 489 F. App'x 116, 127 (6th Cir. 2012) (unpublished).

19

In light of the foregoing, we find Heard has failed to meet his burden to show Dulayev's conduct "violated a federal constitutional . . . right" that "was clearly established at the time of" the event. *Sawyers*, 962 F.3d at 1282. None of the cases cited by Heard mirror the circumstances in this case, where Dulayev had ordered Heard to crawl, threatened the use of his Taser, and repeatedly ordered Heard to stop, and where Heard had continued to step toward Dulayev in close proximity. *Cf. Coronado v. Olsen, et al.*, No. 20-4118, slip op. at 8–11 (10th Cir., Jan. 18, 2022) (unpublished) (finding use of a Taser justified where officers responded to a 911 call about a plaintiff making serious threats of violence, and where plaintiff ignored orders to put his "hands up" and "get on the ground" and took three steps toward the officers). Accordingly, we reverse the district court's denial of summary judgment as to Dulayev and remand with instructions to grant Dulayev qualified immunity and enter judgment in Dulayev's favor.

## IV.

Lastly, we consider the district court's denial of summary judgment as it relates to the City. Unlike Dulayev, the City "cannot invoke the collateral order doctrine to" appeal the district court's denial of its motion for summary judgment. *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995) (noting that municipalities are not entitled to the qualified immunity defense). Instead, the City asks us to exercise pendent appellate jurisdiction over its appeal, arguing its appeal is "inextricably intertwined" with Dulayev's appeal. *See Cox v. Glanz*, 800 F.3d 1231, 1255–56 (10th Cir. 2015).

Pendent appellate jurisdiction is a "narrow" "extension of [this court's] jurisdiction" and "is generally disfavored." *Moore*, 57 F.3d at 929–30.  In some cases, we may exercise pendent appellate jurisdiction where the "pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal." *Id.* at 930.[9]  That is, we may consider a pendent claim "when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." *Id.* (emphasis omitted).

"In cases where we . . . resolve [the related] claim under the clearly-established-law prong" of the qualified immunity defense, however, "we have repeatedly declined to exercise pendent appellate jurisdiction over [the] municipal-liability" claim. *Brown v. The City of Colorado Springs*, 709 F. App'x 906, 916 (10th Cir. 2017) (unpublished) (citations omitted).  "This is because . . . when [this court] resolve[s] an individual-capacity § 1983 claim on the clearly-established-law prong . . . [the] analysis often, as a matter of law, does not turn on issues inextricably intertwined with those implicated by" a municipal liability claim "arising out of the same facts." *Cox*, 800 F.3d at 1256 (emphasis omitted).

Having resolved Dulayev's appeal under the clearly-established-law prong, this court declines to exercise its pendent appellate jurisdiction over the City's appeal. *Brown*, 709 F. App'x at 916.  Indeed, the City only asserts its appeal is

---

[9] We have also noted that "pendent appellate jurisdiction might still be appropriate . . . where review of the nonappealable decision is 'necessary to ensure a meaningful review' of the appealable one." *Moore*, 57 F.3d at 930 (citation omitted). The City, however, does not argue that this possible justification applies here.

inextricably intertwined with Dulayev's insofar as this case could have been resolved under the constitutional-violation prong. Accordingly, Heard's motion to dismiss is granted in part, and this case is remanded to the district court for further proceedings.

## V.

In sum, we grant in part and deny in part Heard's motion to dismiss. We reverse the district court's denial of summary judgment with respect to Dulayev and remand with instructions to grant Dulayev qualified immunity and enter judgment in Dulayev's favor. We decline to exercise pendent jurisdiction over the City's appeal and remand for further proceedings consistent with this opinion.[10]

---

[10] To the extent any part of Heard's motion to dismiss remains, such as whether this court has jurisdiction to consider the defendants' first issue on appeal (their argument regarding the first prong of the qualified immunity analysis), we deny it as moot.