FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 3, 2022**

**Christopher M. Wolpert
Clerk of Court**

_____

IRA LEE WILKINS,

    Plaintiff - Appellant,

v.

CITY OF TULSA, OKLAHOMA;
OFFICER WILL MORTENSON;
OFFICER ANGELA EMBERTON;
OFFICER EDEL RANGEL,

    Defendants - Appellees.

No. 21-5052

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:19-CV-00069-TCK-JFJ)**

_____

Robert M. Blakemore (Daniel Smolen with him on the briefs) Smolen & Roytman, Tulsa, Oklahoma, for Plaintiff - Appellant.

T. Michelle McGrew (Kristina L. Gray with her on the brief) City of Tulsa, Tulsa, Oklahoma for Defendants - Appellees.

_____

Before **MATHESON**, **EBEL**, and **BACHARACH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Three Tulsa police officers, dispatched late at night to a parking lot, found Ira

Lee Wilkins asleep in the driver's seat of a running vehicle. They smelled alcohol on

his person, ordered him out of his car, and eventually forced him to the ground, where they pepper sprayed him.

Mr. Wilkins sued the officers under 42 U.S.C. § 1983, alleging they used excessive force in violation of the Fourth Amendment. He also named the City of Tulsa (the "City"). The district court granted summary judgment to the officers, concluding they were entitled to qualified immunity because they did not use excessive force. Having found no constitutional violation, the court granted summary judgment to the City. Mr. Wilkins now appeals.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse. A reasonable jury could find that the officers' use of pepper spray was excessive force. Under such a finding, the officers violated clearly established Fourth Amendment law. We remand for further proceedings, including consideration of the municipal liability claim against the City.

## I.  BACKGROUND

### A. *Factual History*

We draw the following facts from the parties' statements of undisputed facts, video evidence, the officers' deposition testimony, and Mr. Wilkins's declaration.[1] On review of summary judgment, we view the facts in the light most

---

[1] Appellees argue that Mr. Wilkins's declaration fails to satisfy Federal Rule of Civil Procedure 56(c)(4) because it is unsworn and does not state that it is based on his personal knowledge or that he is competent to testify. Aplee. Br. at 18-19. That argument fails. Mr. Wilkins's declaration satisfies 28 U.S.C. § 1746 because it is signed, dated, and made under penalty of perjury. *See* Fed. R. Civ. P. 56(c)(4) advisory committee's notes to 2010 Amendments ("28 U.S.C. § 1746 allows a

favorable to the non-moving party, here Mr. Wilkins, and draw reasonable inferences in his favor. *See Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 978 F.3d 1165, 1171 (10th Cir. 2020). But when a "videotape quite clearly contradicts the version of the story told by [the non-moving party]," we cannot "adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *see also Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) ("[W]e will accept the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' the plaintiff's version of events." (quoting *Scott*, 550 U.S. at 380)).

1. **Initial Encounter with Mr. Wilkins**

The Tulsa Police Department employed Will Mortensen,[2] Angela Emberton, and Edel Rangel as police officers. Mr. Mortensen was an Officer-in-Training assigned to Officer Rangel, his Field Training Officer. On February 5, 2017, at approximately 12:30 a.m., all three officers were dispatched to a Tulsa car dealership parking lot. After arriving, Officer Rangel activated his body camera. Mr. Wilkins

---

written unsworn declaration . . . subscribed in proper form as true under penalty of perjury to substitute for an affidavit."). His declaration is based on personal knowledge because "his statements exclusively consist of a first-hand narrative." *Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021); *see also* Fed. R. Evid. 602. And nothing indicates that Mr. Wilkins is not competent to testify. *See Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (unpublished) (competence to testify may be inferred from declaration) (cited as instructive under 10th Cir. R. 32.1 and Fed. R. App. P. 32.1); *see also* Fed. R. Evid. 601 ("Every person is competent to be a witness unless these rules provide otherwise.").

[2] Mr. Mortensen's last name was misspelled in the district court's case caption and thus is misspelled in this case caption.

3

was asleep in the driver's seat of his vehicle.  The vehicle was running, and the radio

was playing loudly.  Rangel BodyCam Footage, pt. 1 at 0:53-1:14.

The officers testified that they smelled alcohol on Mr. Wilkins's person, Aplt.

App., Vol. I at 130-32, 151, 159, 162, but Mr. Wilkins stated that he "had not

consumed any alcohol," Aplt. App., Vol. II at 285 ¶ 2.[3]  Officer Mortensen believed

Mr. Wilkins was committing the crime of actual physical control of a vehicle while

intoxicated and ordered him to exit the vehicle.  *See* Okla. Stat. tit. 47, § 11-902(A);

Aplt. App., Vol. II at 314-15; Rangel BodyCam Footage, pt. 1 at 1:04-08.  Mr.

Wilkins complied, and Officer Mortensen handcuffed Mr. Wilkins's arms behind his

back.

2.  **The Search and Takedown of Mr. Wilkins**

Officer Mortensen began to search Mr. Wilkins.  He and Officer Emberton

stood on each side of Mr. Wilkins, with his back turned to them.  Rangel BodyCam

Footage, pt. 1 at 2:16-3:58.  About one minute into the search, Officer Mortensen

forced Mr. Wilkins against the vehicle.  *Id.* at 3:30.  Mr. Wilkins asked what he was

doing, *id.* at 3:28-31, and asked why he was "bending [his] wrists," *id.* at 3:32-34.

Officer Mortensen laughed and said, "I'm going to bend a lot more if you keep acting

like that."  *Id.* at 3:34-38.  Officers Emberton and Mortensen contend that while he

---

[3] Officers Rangel and Mortensen testified that they observed an empty liquor bottle on the floorboard of Mr. Wilkins's vehicle.  Aplt. App., Vol. I at 131-32, 145, 153.  Mr. Wilkins stated that there was no bottle.  Aplt. App., Vol. II at 285 ¶¶ 2, 3.  No bottle is visible in the video.

was standing and handcuffed, Mr. Wilkins "grabbed [Officer Mortensen's] hand." Aplt. App., Vol. I at 170; *id.* at 162. Mr. Wilkins disputes "forcefully grab[bing] any officer's hand during the incident." Aplt. App., Vol. II at 285 ¶ 6. We resolve this factual dispute in Mr. Wilkins's favor. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021) ("[A]ll disputed facts must be resolved in favor of the party resisting summary judgment." (quotations omitted)).

Mr. Wilkins then leaned against the car. Rangel BodyCam Footage, pt. 1 at 3:38. Officer Mortensen grabbed his upper body and said, "Quit flexing up on me." *Id.* at 3:48-55. At this point, Officer Mortensen and Officer Emberton held Mr. Wilkins's upper arms. *Id.* at 3:54-4:02. Officer Rangel testified that he "could see the two officers . . . about to lose physical control of Ira Wilkins." Aplt. App., Vol. II at 299. All three officers forced Mr. Wilkins to the ground. Rangel BodyCam Footage, pt. 1 at 3:59-4:06.

3. **On the Ground after the Takedown**

Following the takedown, Mr. Wilkins was facedown on his stomach. *Id.* at 4:07. Officer Emberton testified that the officers were "on him" and that she held his legs. Aplt. App., Vol. II at 343, 338-40. Mr. Wilkins said, "Okay, man. [Inaudible.] I'm not doing nothing to you. Please, man." Rangel BodyCam Footage, pt. 1 at 4:13-17. Mr. Wilkins repeatedly said, "Please, man," and told the officers, "You're breaking my f---ing wrists." *Id.* at 4:17-32. The officers contend that Mr. Wilkins continued to resist, attempted to stand, and grabbed Officer Mortensen's hand. Aplt. App., Vol. I at 154, 167, 170. Mr. Wilkins denies resisting and grabbing Officer

Mortensen's hand. Aplt. App., Vol. II at 285 ¶¶ 5, 6. Again, we resolve these factual disputes in Mr. Wilkins's favor.

Approximately 30 seconds after the officers forced Mr. Wilkins to the ground, Officer Rangel instructed Officer Mortensen to use pepper spray on Mr. Wilkins.[4] Rangel BodyCam Footage, pt. 1 at 4:34-39. Without warning, Officer Mortensen sprayed pepper spray in Mr. Wilkins's face and stopped when Officer Rangel said, "That's enough." *Id.* at 4:43-45. Officer Mortensen then continued searching Mr. Wilkins. *Id.* at 5:18-44. Officer Rangel told Mr. Wilkins to "quit moving" and repeatedly asked, "You [want to] get some more spray?" *Id.* at 5:26-37. Officer Mortensen completed the search.

Mr. Wilkins was charged with assault and battery upon a police officer, actual physical control of a vehicle while intoxicated, and resisting arrest. All charges were later dismissed.

### B. *Procedural History*

Mr. Wilkins filed his § 1983 complaint in the United States District Court for the Northern District of Oklahoma. He claimed the officers used excessive force in violation of the Fourth Amendment when they forced him to the ground, sat on top of him, and pepper sprayed him. Mr. Wilkins also sued the City, alleging an affirmative

---

[4] The parties refer in their briefs to oleoresin capsicum, the principal chemical agent in pepper spray, which "caus[es] both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages." *Fogarty v. Gallegos*, 523 F.3d 1147, 1152 n.4 (10th Cir. 2008).

link between the deprivation of his constitutional rights and Tulsa Police Department policies, practices, and/or customs.

Defendants moved for summary judgment. The officers invoked qualified immunity, arguing they did not violate Mr. Wilkins's Fourth Amendment rights and that his rights were not clearly established. The City argued that without a constitutional violation, it could not be liable and that any alleged violation was not the result of a City policy or custom. In his opposition to summary judgment, Mr. Wilkins clarified his municipal liability claim, alleging that the City (1) failed to train its employees and (2) ratified the officers' unconstitutional conduct. Aplt. App., Vol. II at 280.

The district court granted summary judgment for all Defendants. It held that the officers were entitled to qualified immunity because they did not use excessive force. The court determined the officers' takedown of Mr. Wilkins was reasonable "in light of [his] failure to heed the officers' commands that he stop flexing and moving around." *Id.* at 448. It further concluded that the use of pepper spray was reasonable due to Mr. Wilkins's "continued movement and resistance" on the ground. *Id.* at 448-49. The court did not address whether the law was clearly established. It granted summary judgment for the City on the municipal liability claim because there was no constitutional violation.

## II. DISCUSSION

"We review a district court's grant of summary judgment de novo, applying the same legal standard as the district court." *Rowell*, 978 F.3d at 1170 (quotations

7

omitted).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When applying this standard, we review the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1216 (10th Cir. 2021) (quotations omitted).  We conduct our review "from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties."  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (quotations omitted); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

We address below whether the district court correctly granted qualified immunity to the officers and conclude it did not because (1) a reasonable jury could find they used excessive force on Mr. Wilkins and (2) they violated clearly established Fourth Amendment law.  Because the officers were not entitled to qualified immunity, we reverse summary judgment in their favor.  As for the municipal liability claim, because a jury could find a constitutional violation by the officers, we also reverse summary judgment for the City and remand for further proceedings.

### A. *Qualified Immunity for the Officers*

1. **Legal Background**

    a. *Qualified immunity*

Section 1983 of Title 42 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

"Persons sued under § 1983 in their individual capacity may invoke the defense of qualified immunity."  *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021).  Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted).  When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation.  *See id.* at 232; *Duda*, 7 F.4th at 909.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotations omitted).  "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right."  *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1197 (10th Cir. 2019) (quotations omitted).  "[A] case directly on point" is not

necessary if "existing precedent [has] placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quotations omitted).

    b. *Excessive force under the Fourth Amendment*

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).[5] In evaluating a claim of excessive force, courts consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To assess objective reasonableness, we evaluate whether the totality of the circumstances justified the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In *Graham v. Connor*, the Supreme Court identified three non-exclusive factors to evaluate whether a use of force was excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

---

[5] The Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

10

Under the first factor, a minor offense supports only the use of minimal force. *See Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016). A misdemeanor committed in a "particularly harmless manner . . . reduces the level of force that [is] reasonable for [the officer] to use." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

The second factor "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." !*Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) (quotations omitted). "We must look at whether the officers or others were in danger at the precise moment that they used force." *Emmett*, 973 F.3d at 1136 (quotations and alterations omitted). "[A]n officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officer or others." *Mglej v. Gardner*, 974 F.3d 1151, 1168 (10th Cir. 2020) (quotations omitted).

As to the third factor, we evaluate whether the suspect "attempt[ed] to flee or actively resist[ed] the arrest or search." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1191 (10th Cir. 2017). We consider any resistance during the suspect's encounter with officers. *See McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (evaluating whether the suspect engaged in "active resistance" after he had been handcuffed); *Dixon v. Richer*, 922 F.2d 1456, 1462-63 (10th Cir. 1991) (analyzing suspect's resistance during and following the officer's frisk and noting suspect was not under arrest). We "have consistently concluded that a

11

suspect's initial resistance does not justify the continuation of force once the resistance ceases." *McCoy*, 887 F.3d at 1051 (collecting cases).

2. **Application**

Mr. Wilkins argues the officers used excessive force when they forced him to the ground and sprayed him with pepper spray.[6] Addressing the two prongs of qualified immunity below, we conclude that the use of pepper spray violated Mr. Wilkins's clearly established right to be free from the additional use of force after he was effectively subdued. The officers were not entitled to qualified immunity. We thus reverse summary judgment for the officers.

a. *Prong one - constitutional violation*

Under the *Graham* factors, even assuming the officers acted reasonably when they forced Mr. Wilkins to the ground, a reasonable jury could find that the officers' use of pepper spray was objectively unreasonable. Mr. Wilkins thus showed he suffered a constitutional violation. We address the *Graham* factors below.

    i.  Severity of the crime

Under the first factor—severity of the crime—only minimal force was warranted. The officers suspected Mr. Wilkins of committing the crime of actual physical control of a motor vehicle while intoxicated, a misdemeanor in Oklahoma.

---

[6] We aggregate the officers' conduct because they do not seek individualized analysis as to their liability and they "engaged in a group effort." *Est. of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014); *see also Weigel v. Broad*, 544 F.3d 1143, 1151-53 (10th Cir. 2008) (analyzing officers' actions collectively when one officer applied force to individual's back while the other officer returned to his car).

12

*See* Okla. Stat. tit. 47, § 11-902(C); Aplt. App., Vol. II at 326-27. "[W]e have held that the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor." *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018). This factor thus weighs against the use of anything more than minimal force.

### ii. Immediate threat

The second factor weighs against the officers because Mr. Wilkins did not pose an immediate threat after the takedown. He was facedown on his stomach, handcuffs secured his arms, officers were on him, Officer Emberton held his legs, and he did not resist. Aplt. App., Vol. I at 102, 167; Aplt. App., Vol. II at 261, 338, 340; Rangel BodyCam Footage, pt. 1 at 4:27. During the nearly 30 seconds preceding the pepper spray, Mr. Wilkins said "please, man," "you're breaking my f---ing wrists," and "I'm not doing nothing to you." Rangel BodyCam Footage, pt. 1 at 4:08-4:35. He did not present an immediate threat when Officer Mortensen sprayed him with pepper spray. *See Emmett*, 973 F.3d at 1136 (after tackling suspect, officer "had effectively neutralized any safety concerns"); *see also Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (no immediate threat because suspect was under the officers' control).

Officer Mortensen testified that "[t]here was a possibility [Mr. Wilkins] could hurt [the officers] with a weapon" before he was fully searched. Aplt. App., Vol. I at 146-47; *see also id.* at 167 (Officer Emberton testifying that there is a safety risk before an officer completes a search because "there could be a weapon" and Mr. Wilkins "was a risk . . . since he had not been fully searched"). Even so, it was not

13

reasonable to pepper spray Mr. Wilkins "solely on the basis of that suspicion." *Dixon*, 922 F.2d at 1463. And nothing in the record shows the officers believed or had reason to believe that Mr. Wilkins had a weapon or even that they asked if he was armed. No gun was reported or seen, Mr. Wilkins was not suspected of committing a crime involving a weapon, his hands were handcuffed behind his back, and he did not threaten harm. Officer Mortensen's detailed incident report, completed within hours of the incident, does not indicate that any officer believed Mr. Wilkins was armed. Aplt. App., Vol. I at 170.

Our precedent confirms there was no immediate threat under the circumstances. In *Davis v. Clifford*, 825 F.3d 1131 (10th Cir. 2016), we concluded the suspect did not pose an immediate threat because there was "no evidence that [she] had access to a weapon or that she threatened harm to herself or others." *Id.* at 1135. We said the second *Graham* factor showed the officers used excessive force by pulling the suspect through her broken car window after she refused to exit her vehicle following a traffic stop. *Id.* In *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), we determined the suspect did not pose an immediate threat because, though he held a small knife, he "made no threats[,] was not advancing on anyone," and "had not affirmatively led anyone to believe that he had a firearm." *Id.* at 1159-60. We said that, based on the angle of the suspect's hands and the lighting at the scene, the officer unreasonably believed that the suspect was pointing a gun at him. *Id.*

Even assuming the officers reasonably believed Mr. Wilkins was armed, they neutralized any immediate threat by taking him to the ground, gaining control over him, and preventing him from reaching a weapon. Indeed, Officer Emberton testified that officers take suspects to the ground "to prevent the individual from accessing a weapon of any sort." Aplt. App., Vol. I at 167.[7]

### iii. Resistance and attempt to flee

Under the third factor, no force was justified after the takedown based on resistance of attempt to flee. Mr. Wilkins was on the ground in a prone position, secured by three officers, and pleading with the officers to stop. Rangel BodyCam Footage, pt. 1 at 4:04-4:44.

The officers contend Mr. Wilkins resisted while on the ground by "grabbing [Officer] Mortensen's fingers and . . . attempting to stand." Aplee. Br. at 6. But Mr. Wilkins stated he did not "grab any officer's hand" or "resist the searching of his person." Aplt. App., Vol. II at 285 ¶¶ 5, 6. The video does not contradict Mr. Wilkins's statement. Indeed, in the seconds leading up to the officers' use of pepper spray, the video does not even show Mr. Wilkins. Rangel BodyCam Footage, pt. 1 at 4:38-4:44. We must credit his version of the events on summary judgment. *See Emmett*, 973 F.3d at 1135. "At trial, the factfinder will have to decide" whether Mr.

---

[7] The officers' expert said in his report that he had "reviewed cases where a subject handcuffed behind their back was able to grab a weapon and fatally shoot the officer." Aplt. App., Vol. I at 228 ¶ 109. But the report cites no cases, nor does it provide any factual context. In particular, it does not address when three officers have effectively subdued a suspect.

Wilkins resisted, *id.*, but at this stage, we view the facts in the light most favorable to Mr. Wilkins and draw all reasonable inferences in his favor, *Rowell*, 978 F.3d at 1171. Mr. Wilkins was effectively subdued and not resisting when Officer Mortensen sprayed him. *See Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (reasonable jury could decide suspect not resisting when pepper sprayed because he was handcuffed and face down on the ground even if he had previously resisted). The third *Graham* factor thus weighs against the officers' use of force following the takedown.

*     *     *     *

In sum, the use of pepper spray was unreasonable. Mr. Wilkins was not resisting, was not a threat to officer safety, and was under the officers' control. *See Emmett*, 973 F.3d at 1136-37.

On summary judgment, the district court was required to accept Mr. Wilkins's version of events so long as it was not "blatantly contradicted" by the video. *See Scott*, 550 U.S. at 380. Instead, the district court stated that pepper spray was reasonable due to Mr. Wilkins's "continued movement and resistance," Aplt. App., Vol. II at 448-49, and that the "bodycam video *appear[ed]* to confirm the officers' testimony," *id.* at 445 (emphasis added). But we have carefully viewed the video and conclude that it does not blatantly contradict Mr. Wilkins's account. The district court erred by adopting the officers' version of events. A reasonable jury could find that the use of pepper spray was unreasonable in violation of the Fourth Amendment.

b. *Prong two - clearly established law*

The law clearly established that the use of pepper spray on Mr. Wilkins was unconstitutional.

i. Legal background

Two of our cases—*Weigel v. Broad* and *Perea v. Baca*—are analogous to this case. In both, we evaluated officers' additional use of force after they had tackled suspects to the ground.

In *Weigel*, we held that two officers used excessive force by applying pressure to a suspect's back when he was facedown, handcuffed, and his legs were bound. 544 F.3d at 1154-55. Officers encountered the suspect following a traffic accident. *Id.* at 1147. He appeared intoxicated and agreed to complete a field sobriety test. *Id.* at 1147-48. But the suspect instead walked across the interstate, so an officer tackled him to the ground. *Id.* at 1148. After the takedown, the suspect "fought vigorously, attempting repeatedly to take the [officers'] weapons and evade handcuffing." *Id.* at 1148. The suspect "continued to struggle" after the officers applied handcuffs. *Id.* A bystander bound the suspect's legs, and an officer applied pressure to the suspect's back. *Id.* We concluded force was excessive when the officer continued to apply pressure to the suspect's back after he stopped struggling. *Id.* at 1153. We explained that the officers used force "even after it was readily apparent for a significant period of time (several minutes) that [the suspect] was fully restrained and posed no danger." *Id.* at 1154.

In *Perea*, we held officers used excessive force by tasing a suspect "after he was effectively subdued and brought under the officers' control." 817 F.3d at 1204. Two officers had responded to calls that the suspect was on drugs and pacing in his yard. *Id.* at 1201. They saw the suspect commit a minor traffic violation on his bicycle. *Id.* at 1203. The officers tackled him to the ground and tried to detain him, but the suspect "struggled and thrashed while holding a crucifix." *Id.* at 1201. One of the officers repeatedly tased him, and "[a]t some point before the taserings stopped, [the officers] were able to get [the suspect] on the ground on his stomach, with both officers on top of him, effectively subduing him." *Id.* We explained that "[e]ven if [the suspect] initially posed a threat," the justification for additional force "disappeared when [he] was under the officers' control." *Id.* at 1204. "[I]t is . . . clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Id.*

Our more recent decisions reenforce that the law was clearly established when Mr. Wilkins was pepper sprayed.[8] In *Emmett*, we held that an officer used excessive force by tasing a suspect shortly after tackling him to the ground and the suspect had ceased resisting. 973 F.3d at 1136-37. We said that as of 2013, the officer "was on

---

[8] Although these cases were decided after February 5, 2017, both recognized the law was clearly established before that date. "This court has recognized that a case decided after the incident underlying a § 1983 action can state clearly established law when that case ruled that the relevant law was clearly established as of an earlier date preceding the events in the later § 1983 action." *Soza v. Demsich*, 13 F.4th 1094, 1100 n.3 (10th Cir. 2021).

18

notice that using a taser without providing an adequate warning against a misdemeanant who had ceased actively resisting was unconstitutional." *Id.* at 1139. In *McCoy*, we said that as of 2011, it was "clear that the use of force on effectively subdued individuals violates the Fourth Amendment" and concluded that using force on a suspect who was handcuffed, zip-tied, and had ceased resisting was excessive. 887 F.3d at 1051, 1052.

### ii.  Analysis

On February 5, 2017, a reasonable officer would have known that use of pepper spray on Mr. Wilkins when he was facedown, handcuffed, legs secured, and not resisting was unconstitutional.  Our precedent clearly established that force against a subdued suspect who does not pose a threat violates the Fourth Amendment.

*Weigel* and *Perea* both involved suspects who initially resisted but were subdued when officers used additional force.  *See Weigel*, 544 F.3d at 1148 (suspect struggled with officers after tackled); *Perea*, 817 F.3d at 1203 (suspect resisted after tackled).  Here, for over thirty seconds, Mr. Wilkins, like the suspect in *Weigel*, was on his stomach, his arms and legs secured, officers on him, and not resisting.  *See* 544 F.3d at 1152.  A reasonable jury could conclude based on the record that Mr. Wilkins was subdued when the officers used pepper spray.

The officers contend that no reasonable officer would have thought the use of pepper spray on a "suspect who continued to resist and prevent the search of his pockets would be unlawful."  Aplee. Br. at 26.  But their argument presumes their version of the facts, not Mr. Wilkins's, which we must accept at summary judgment.

19

*See Scott*, 550 U.S. at 380.  Under the proper view of the facts, Mr. Wilkins did not

resist after the officers forced him to the ground.  Shooting pepper spray into his face

violated clearly established law.  We thus reverse summary judgment for the officers

on Mr. Wilkins's excessive force claim because they were not entitled to qualified

immunity.

### B.  *Municipal Liability*

To state a municipal liability claim against the City, Mr. Wilkins must show

(1) an official policy or custom, (2) causation, and (3) deliberate indifference.  *See*

*Est. of Burgaz v. Bd. of Cnty. Comm'rs for Jefferson Cnty., Colo.*, --- F.4th ----, 2022

WL 1112761, at *6 (10th Cir. Apr. 14, 2022).  In his summary judgment briefing

before the district court, Mr. Wilkins argued (1) the City failed to train its officers

and (2) final City policymakers ratified their subordinates' decisions.  Aplt. App.,

Vol. II at 281 ("[T]here is significant evidence establishing a shocking failure to train

TPD officers with respect to the use of force" and "the City ratified the

unconstitutional conduct by determining that the officers' unconstitutional use of

force was within policy.").

For Mr. Wilkins to succeed on either theory, he must make a threshold

showing of an underlying constitutional violation by an individual officer.  *See*

*Burgaz*, 2022 WL 1112761, at *6 (under failure-to-train theory, individual officer

must have committed a constitutional violation); *Bryson v. City of Oklahoma City*,

627 F.3d 784, 790 (10th Cir. 2010) (under ratification theory, "a final decisionmaker

[must] ratif[y] an employee's specific unconstitutional actions").[9] Because it found no constitutional violation by the individual officers, the district court granted summary judgment for the City on Mr. Wilkins's municipal liability claim.

The district court erred in granting summary judgment to the City on this ground because, as we have discussed, a reasonable jury could find that the officers violated the Fourth Amendment. We decline to address the remaining elements of Mr. Wilkins's municipal liability claim. The district court did not do so. Neither does Mr. Wilkins on appeal. We remand for the district court revisit the municipal liability claim. *See Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 654 (10th Cir. 2017) (remanding for district court to evaluate municipal liability claim because a reasonable jury could find constitutional violation); *Becker v. Bateman*, 709 F.3d 1019, 1027 (10th Cir. 2013) (same).

## III. **CONCLUSION**

We reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

---

[9] "In other types of *Monell* claims, such as those alleging an unconstitutional policy or custom, plaintiffs need not demonstrate an individual officer committed a constitutional violation. Instead, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Burgaz*, 2022 WL 1112761, at *6 (quotations omitted). Mr. Wilkins does not advance this theory here.