**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**September 10, 2024**

_____

**Christopher M. Wolpert**
**Clerk of Court**

JOSE ARROYO; HEATHER BOEHM;
SAMUEL CORDO; AMBER MILLER,

    Plaintiffs - Appellees,

v.

ANDREW PRIVETT,

    Defendant - Appellant,

and

ALEXANDER HALL; JOSHUA MOORE;
TIMOTHY HOLCOMB; DUSTIN ROSS;
CHAD WEISE; UNITED STATES OF
AMERICA,

    Defendants.

No. 22-1307
(D.C. No. 1:21-CV-01687-CNS-MDB)
(D. Colo.)

_____

JOSE ARROYO; HEATHER BOEHM;
SAMUEL CORDO; AMBER MILLER,

    Plaintiffs - Appellees,

v.

ALEXANDER HALL; JOSHUA MOORE,

    Defendants - Appellants.

and

ANDREW PRIVETT; TIMOTHY
HOLCOMB; DUSTIN ROSS; CHAD
WEISE; UNITED STATES OF

No. 22-1309
(D.C. No. 1:21-CV-01687-CNS-MDB)
(D. Colo.)

AMERICA,

    Defendants.

_____

JOSE ARROYO; HEATHER BOEHM;
SAMUEL CORDO; AMBER MILLER,

    Plaintiffs - Appellees,

v.

TIMOTHY HOLCOMB; DUSTIN ROSS;
CHAD WEISE,

    Defendants - Appellants,

and

ALEXANDER HALL; JOSHUA MOORE;
ANDREW PRIVETT; UNITED STATES
OF AMERICA,

    Defendants.

No. 22-1310
(D.C. No. 1:21-CV-01687-CNS-MDB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **MORITZ**, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

Following a botched training exercise at a federal prison in Florence,

Colorado, plaintiff prison employees Jose Arroyo, Heather Boehm, Samuel Cordo,

and Amber Miller filed this action in federal district court against defendant prison

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

2

employees Timothy Holcomb, Chad Weise, Joshua Moore, Alexander Hall, Dustin Ross, and Andrew Privett.[1] The government filed a certification under the Westfall Act, 28 U.S.C. § 2679, substituting itself for defendants and certifying that at the time of the events described in the complaint, defendants were acting within the scope of their employment with the Bureau of Prisons (BOP). But the district court granted plaintiffs' motion to set aside the Westfall certification, ruling that defendants were acting outside the scope of their employment. Finding no error in the district court's application of the governing scope-of-employment legal standard to its factual findings, we affirm.

## Background

We begin with a detailed factual description of the training exercise, based on the district court's factual findings, which are not in dispute for purposes of this appeal.[2] We then briefly recite the procedural background before turning to our analysis.

---

[1] Plaintiffs named other individual defendants as well, but they are not involved in this appeal.

[2] The material facts were disputed below, but the district court resolved those disputes in a set of detailed factual findings. And at oral argument, defendants confirmed that "for purposes of this appeal, [they were] proceeding with the findings of fact the district court made." Oral Argument at 4:21–4:28. This confirmation was in keeping with defendants' opening brief, which includes no argument that the district court's factual findings were clearly erroneous.

A.    Factual Background

On June 20, 2019, the prison conducted a semiannual training exercise. All plaintiffs and defendants were BOP employees at the time.[3] On plaintiffs' side, Arroyo was a case manager; Boehm was a drug-treatment specialist temporarily working in the prison's business office while on crutches; and Cordo worked in the business office with Miller, who was three months pregnant. On defendants' side, Holcomb was a lieutenant and the leader of the prison's special operations response team, known as SORT; Weise was a correctional counselor and SORT's assistant team leader; Moore, Hall, and Ross were general members of the SORT team that day; and Privett was a BOP lieutenant at another federal correctional facility who was visiting the prison to observe and evaluate the training exercise.

SORT is one of the prison's crisis-management teams, along with the Crisis Negotiation Team (CNT). CNT uses crisis-intervention techniques like negotiation to safely resolve hostage situations. SORT, on the other hand, is a tactical team that typically gets involved after negotiations fail; it must be specifically activated by the warden. Training exercises like the one at issue are part of SORT's week-long annual certification process.

This training exercise simulated a hostage situation in the prison's administrative building: former SORT member Christopher Fernandez played the

---

[3] None of the plaintiffs are currently employed by the BOP. All defendants remain employed by the BOP, except Holcomb, who has retired.

4

role of a hostage taker who entered the building and took various mock hostages. When the exercise began, plaintiffs were in the business office with three other individuals. BOP policy directs that in a hostage situation, staff who are not members of a crisis-management team and who cannot safely exit the affected area should establish a safe haven and shelter in place until an all-clear announcement. Accordingly, plaintiffs planned to shelter in the business office; but because they knew that two other business-office employees (Heather Dunderman and Adrian Crespin) were among the mock hostages, they believed that the hostage taker could have keys to that office. So rather than merely lock the business-office door, plaintiffs and the others locked themselves in a small cashier's cage inside the business office, for which Cordo had the only key. They then called main control to report the names of the seven individuals sheltering in the cashier's cage.

Soon after, plaintiffs heard an announcement over the staff radio that SORT member Fernandez "was a 'bad guy'" and that staff should not respond to him over the radios; they also overheard various radio communications from Fernandez to SORT. App. vol. 9, 2245 (quoting App. vol. 6, 1375). As a result, plaintiffs believed that SORT may have been compromised and working with the hostage taker for purposes of the mock exercise. Plaintiffs then received a call from Dunderman, who they knew was one of the mock hostages, asking them to let her into the business office so she could escape. Plaintiffs believed that Dunderman was trying to lure them out of their safe haven on behalf of the mock hostage taker and refused her request, complying with BOP policy to avoid a hostage taker's luring efforts and to

not give up a safe haven. At some point, plaintiffs realized that the phone lines had been cut off and that they could no longer make outgoing calls. They also barricaded the door to the cashier's cage with furniture and objects when they heard keys outside the business office.

After about two hours of CNT's unsuccessful negotiations with the mock hostage taker, SORT executed a written tactical order to breach the administrative building and capture the mock hostage taker. After SORT achieved this objective, its final task was to conduct a secondary search of the building to ensure there were no other threats and that staff members were safe.

During the secondary search, SORT members discovered and tried to communicate with the individuals locked in the cashier's cage, including plaintiffs. Plaintiffs did not respond at first because they continued to believe that SORT may have been compromised and was trying to lure them out of their safe haven. Defendant SORT member Moore asked plaintiffs' colleague Robert Solano if there was a reason for plaintiffs' failure to respond, and Solano told Moore that "they [we]re all just playing the part." *Id.* at 2255 (quoting App. vol. 8, 1936). A few minutes later, plaintiff Cordo received an email from Solano that read, "they just took me out." App. vol. 6, 1437. Based on this email, plaintiffs believed Solano had also been taken hostage by the compromised SORT team. And when defendants enlisted Solano and Crespin (one of the initial business-office mock hostages) to ask plaintiffs to come out, plaintiffs continued to believe that the mock hostages taken by the

6

compromised SORT team were trying to lure them out of their safe haven; so again, they did not respond.

Frustrated by plaintiffs' refusal to answer, defendant SORT member Weise threatened to throw a flash strip under the door of the cashier's cage.[4] At that point, Cordo broke the silence and told SORT that there were people inside the cage. Defendants then repeatedly slammed their bodies against the cage door, demanding that plaintiffs open it, and threatened to deploy oleoresin-capsicum spray (OC spray) if plaintiffs did not comply.[5] The district court specifically found that Moore threatened to use OC spray multiple times and that Holcomb did so at least once.

Next, Weise used a tool to pry open the steel shutters of the cashier's window. At that point, one of the non-plaintiff individuals sheltering in the cashier's cage demanded that defendants stop destroying government property and shouted "out of role"—a phrase that any BOP employee can use during a mock exercise to immediately end the exercise for safety reasons, and a phrase that no defendant ever used throughout the entire incident. Plaintiffs also repeatedly explained to defendants

---

[4] According to the summary-judgment record, a flash strip is a kind of explosive device.

[5] We adopt the shorthand "OC spray" because that's the term used by the parties and the district court. But we note that the more common term would be "pepper spray": oleoresin capsicum is simply "the principal chemical agent in pepper spray, which 'caus[es] both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages.'" *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1271 n.4 (10th Cir. 2022) (alteration in original) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1152 n.4 (10th Cir. 2008)).

that they would not open the door because they believed that SORT was compromised. Even so, SORT member Ross fired Simunition rounds at or into the cashier's cage;[6] five such rounds were recovered from inside the cage.[7]

Meanwhile, defendants continued to threaten to use OC spray, and plaintiffs repeatedly responded by shouting that it was against BOP policy to use OC spray on staff. Hall and Moore nevertheless left to obtain a canister of OC spray, which they brought back to the business office and gave to Weise. Privett also briefly left the business office, returning with a gas mask. At that point, Holcomb and Weise each asked, over the radio, for authorization to deploy OC spray. Authorization was never received. Undeterred, Weise notified the command center by radio that he was going to use the OC spray and then sprayed two bursts—one at the cashier's window and one underneath the door of the cashier's cage. Plaintiffs' eyes began to burn, they began to cough and have difficulty breathing, and they shouted "out of role"

---

[6] Simunition is "a highly[ ]specialized live ammunition specifically designed to replace the standard live ammunition in . . . personal service weapons." *Moore v. Guthrie*, 438 F.3d 1036, 1038 (10th Cir. 2006). It "utilizes smokeless gunpowder as a propellant[] and fires a plastic, liquid-filled, bullet-shaped projectile [that] shatters on impact, marking the target with brightly[ ]colored liquid." *Id.* As "a combat training tool, Simunition cartridges are specifically designed to be painful to a person on impact," and "[a] Simunition projectile striking unprotected skin will leave bruises, welts, and abrasions." *Id.*

[7] Ross claimed in his deposition that he fired because he saw the barrel of a firearm pointing out of the cashier's window, but the district court specifically found Ross was not credible on this point because he did not mention seeing the firearm until months after the incident and no other defendant said they saw a firearm.

continuously. Finally, plaintiffs said they were coming out and started to open the door.

Ross, Weise, and Hall then pushed their way into the cashier's cage in full tactical gear, including helmets and gas masks.[8] They told plaintiffs to get on the ground, which was not possible given the size of the room, the furniture, and the number of people in it. Then, "Ross, Weise, and Hall repeatedly started punching and hitting the individuals inside the cashier's cage," even though plaintiffs and the other individuals in the cage continued to shout "out of role" and at least Ross and Holcomb heard as much. App. vol. 9, 2367. In particular, "Hall repeatedly punched and shoved" one of the non-plaintiff business-office employees, causing plaintiff Boehm to slam into a metal safe; "Weise punched Cordo, struck Arroyo, and skimmed Boehm's cheek with his hand when he tried to punch her"; and "Ross punched . . . Cordo and Arroyo." *Id.* at 2367–68. Ross also "shot . . . Arroyo in the chest at point [b]lank with a Simunition round," which burned through Arroyo's shirt and left a bleeding laceration on his chest. *Id.* at 2368.

BOP policy prohibits the use of OC spray and Simunition rounds in the absence of any threat, and the BOP's employee-conduct standards state that "[a]n employee may not use physical violence, threats, or intimidation . . . toward fellow

---

[8] Defendants disputed who entered the cage and how, but the district court found defendants not credible on these points because their deposition testimony contradicted that of independent observers of these events, including individuals who were inside the cashier's cage but are not plaintiffs in this action.

employees."[9] *Id.* at 2301 (alteration and omission in original) (quoting App. vol. 6, 1508). At no point during these events did defendants report a real emergency to the prison's command center. Thus, the district court concluded that defendants had violated BOP policy and had "no legitimate belief of a real threat or emergency situation to justify the incidents that occurred." *Id.* at 2369.

### B.    Procedural Background

Following this incident, plaintiffs filed a complaint in federal district court asserting state-law claims for intentional infliction of emotional distress and civil conspiracy.[10] The government then intervened with its Westfall certification, substituting itself for defendants on the basis that they were acting within the scope of their employment. *See* § 2679(d)(1). But on plaintiffs' motion, the parties conducted limited discovery on the scope-of-employment issue. Plaintiffs then moved to set aside the Westfall certification.

After the matter was fully briefed, the district court heard oral argument from counsel for plaintiffs and the government; defendants' attorneys were also present at the hearing, but they did not actively participate. The district court then issued an oral

---

[9] The BOP disciplined Weise for his unauthorized use of OC spray by removing him from SORT, but no other defendant was disciplined. As of the date of the district court's decision below, an investigation by the Office of the Inspector General was ongoing.

[10] Plaintiffs also asserted an excessive-force claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), but that claim is not at issue in this appeal.

ruling from the bench in which it set out the undisputed facts, made findings on disputed facts and credibility issues, as we have just described, and ultimately concluded that defendants were acting outside the scope of their employment. Having done so, the district court struck the government's Westfall certification and ordered plaintiffs' state-law claims to proceed against the individual defendants.

The government did not appeal that ruling, but defendants do. *See Osborn v. Haley*, 549 U.S. 225, 238 (2007) (holding that Westfall certification order is immediately appealable under collateral-order exception).

## Analysis

Defendants challenge the district court's decision to strike the government's Westfall certification based on its determination that defendants were acting outside the scope of their employment. We review this determination de novo. *Hockenberry v. United States*, 42 F.4th 1164, 1171 (10th Cir. 2022). And although we would typically review the district court's underlying factual findings for clear error, defendants did not argue for clear error in their opening brief and then expressly disclaimed any clear-error argument during oral argument.[11] *See Maldonado Pinedo*

---

[11] In keeping with their exclusive focus on legal error, defendants' opening brief concludes with their request that we "reverse the [o]rder of the [d]istrict [c]ourt setting aside the Westfall [c]ertification and, *based on de novo review*, [o]rder that the Westfall certification be reinstated." Aplt. Br. 50 (emphasis added). Similarly, in their reply brief, defendants ask us to "reverse the [d]istrict [c]ourt's decision to overturn the Westfall certification and substitute the United States for the individual [d]efendants at trial." Rep. Br. 19–20.

*v. United States*, 814 F. App'x 338, 340 (10th Cir. 2020).[12] We accordingly confine our review of this issue to whether the facts found by the district court show that defendants were acting outside the scope of their employment.

Under the Westfall Act, "federal employees are absolutely immune from state-law tort claims that arise 'out of acts they undertake in the course of their official duties.'" *Hockenberry*, 42 F.4th at 1170 (quoting *Fowler v. United States*, 647 F.3d 1232, 1235 (10th Cir. 2011)). The Act permits the government to certify, in a civil action involving state-law claims against a federal employee, "that the employee 'was acting within the scope of [their] office or employment at the time of the incident out of which the claim arose.'" *Id.* (quoting § 2679(d)(2)). Certification results in the government substituting itself for the employee as the defendant in the action. *Id.*

But the government's scope-of-employment "certification is 'subject to de novo review' in the district court." *Id.* (quoting *Richman v. Straley*, 48 F.3d 1139, 1145 (10th Cir. 1995)). In that review, the government's certification constitutes "prima facie evidence that an employee's challenged conduct was within the scope of [their] employment." *Id.* (quoting *Richman*, 48 F.3d at 1145). And it is the plaintiff's burden to "rebut[] the scope-of-employment certification with specific facts." *Id.* at 1174 (alteration in original) (quoting *Richman*, 48 F.3d at 1145). In assessing the

---

[12] We cite this unpublished case for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

scope of employment, courts apply "the respondeat superior law of the state where the incident occurred." *Id.* at 1170 (quoting *Richman*, 48 F.3d at 1145).

Here, the parties agree that *Moses v. Diocese of Colorado*, 863 P.2d 310 (Colo. 1993), describes the governing Colorado scope-of-employment standard. *Moses* sets out Colorado's two-pronged test for determining whether an employee's alleged intentional tort[13] is within the scope of employment: the employee must (1) be "doing the work assigned . . . by [the] employer, or what is necessarily incidental to that work, or customary in the employer's business" *and* (2) have the "intent in committing the tortious act . . . to further the employer's business." *Id.* at 329–30, 329 n.27.

On the first prong, the district court reasoned that defendants' assigned, incidental, and customary work was to "clear the administrative area, make sure everybody knew the incident was over, and otherwise conclude the [exercise]." App. vol. 9, 2373. But the district court found that defendants had "abandoned the legitimate work of clearing the business office" by making no effort to communicate to plaintiffs that the exercise was over, using OC spray and Simunition in violation of BOP policy, and "essentially engag[ing] in combat with staff members." *Id.* As for the second prong, the district court determined that defendants' conduct was not intended to further the BOP's business. Instead, the district court concluded that

---

[13] Recall that plaintiffs allege state-law claims of intentional infliction of emotional distress and civil conspiracy.

defendants acted out of frustration in response to plaintiffs' justified refusal to respond to defendants' questions and demands to exit the cashier's cage.

On appeal, defendants offer little challenge to the district court's reasoning under either prong. Instead, they maintain that because their assigned task at this point in the training exercise was to clear the room, any conduct they undertook in completing that task was both within the scope of their employment and motivated by an intent to further the BOP's business. Yet *Moses* itself teaches that the scope-of-employment inquiry is more nuanced than defendants suggest. There, the Colorado Supreme Court concluded that a priest acted outside the scope of his employment when he engaged in sexual acts with a parishioner, even though the sexual acts occurred during the course of counseling, which *was* within the scope of the priest's employment. *See Moses*, 863 P.2d at 330. And although defendants suggest that the facts here distinguish this case from *Moses*, we disagree. Just as the priest in *Moses* abandoned his legitimate counseling work by engaging in sexual conduct with a parishioner, defendants here abandoned their legitimate work of clearing the room at the end of the training exercise by using OC spray, firing Simunition rounds, and physically assaulting fellow BOP employees. *See id.* at 329–31.

And *Moses* is not unique in focusing on the employee's specific conduct rather than some overarching employer-focused aim. In an earlier case, the Colorado Supreme Court concluded that where an employee with instructions to escort a former employee off the premises to prevent damage to company property struck the former employee with a pitchfork, it was up to the jury to decide whether the

14

employee acted "from personal, rather than employer-employee considerations." *Packaging Corp. of Am. v. Roberts*, 455 P.2d 652, 653, 655 (Colo. 1969). In so holding, the court explained that the employer "would not be liable if [the employee's] act had no real connection with his employer's business and was purely personal." *Id.* at 655. Similarly, defendants' conduct here had no real connection to the BOP's business of clearing the room and was purely personal because it was motivated by defendants' frustration. Indeed, the district court relied on *Packaging Corp.* for this precise conclusion, and defendants make no effort on appeal to distinguish it.[14]

Thus, under Colorado respondeat superior law, that defendants had been assigned to clear the room is not enough to establish that their conduct was within the scope of their employment. Defendants must instead show that their specific conduct during that task—using OC spray, Simunition rounds, and physical force against fellow BOP employees out of frustration and in direct violation of BOP policy—was within the scope of their employment. Seeking to do so, defendants assert that their conduct was necessitated by plaintiffs' own behavior in refusing to exit the cashier's cage and defendants' purported belief that a real emergency had developed. But these

---

[14] Instead, defendants rely heavily on *Ventura v. Albertson's, Inc.*, 856 P.2d 35 (Colo. App. 1992), a workers' compensation case. But under Colorado law, "[w]orkers' compensation and respondeat superior liability are different theories of liability," so the analysis in workers' compensation cases does not apply in the respondeat superior context. *Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 694 (Colo. App. 2006).

arguments fail to persuade because they directly contradict the district court's unchallenged factual findings that (1) plaintiffs behaved appropriately in the context of the training exercise based on their belief that SORT was compromised and (2) defendants did not believe there was a real emergency, but instead acted out of frustration.[15] Defendants' attempt to explain how each of their individual actions fell within the scope of their employment fails for the same reason—their description of each individual's conduct conflicts with the district court's unchallenged factual findings. For instance, defendants state that "Hall took no actions to injure anyone else." Aplt. Br. 26. Yet this assertion directly contradicts the district court's factual finding that "Hall repeatedly punched and shoved" one of the non-plaintiff business-office employees, causing Boehm to slam into a metal safe. App. vol. 9, 2367. Similarly, defendants assert that "Moore did not threaten to use OC spray at any point." Aplt. Br. 27. But again, this statement contradicts the district court's factual finding that "Moore threatened multiple times to shoot OC spray." App. vol. 9, 2361.

Last, defendants assert that the district court erred by focusing "on whether [defendants] violated BOP policies," but we discern no error on this front. Aplt.

---

[15] Defendants repeatedly but incorrectly contend in their opening brief that plaintiffs "conceded that Privett, Holcomb, and Weise believed this may have been 'a real-life hostage situation.'" Aplt. Br. 19 n.4 (quoting App. vol. 9, 2347); *see also id.* at 29, 34. In so doing, defendants selectively quote a statement made by plaintiffs' counsel during oral argument before the district court. In context, plaintiffs' counsel answered the district court's question about whether defendants genuinely believed there was a real emergency by stating that although Privett, Holcomb, and Weise *purported* to hold such belief, the "the evidence [did not] suggest that there was actually a genuine threat in the cashier's cage." App. vol. 9, 2347.

Br. 24. The district court did not treat the violation of policy as "determinative," *id.*;
it merely noted, as one fact among many, that defendants violated BOP policy by
deploying OC spray and firing Simunition rounds without authorization and by using
force against fellow employees. This reasoning is consistent with Colorado law,
under which an employer's policies are relevant to the scope-of-employment inquiry.
*See Moses*, 863 P.2d at 330 (noting testimony that priest's sexual conduct with
parishioner was serious breach of priest's ordination vows).

In sum, defendants' actions were not assigned, incidental, or customary work;
nor were they motivated by a subjective intent to further the BOP's business.
Because defendants' conduct thus falls outside the scope of their employment, *see id.*
at 329–30, 329 n.27, we affirm the district court's order striking the Westfall
certification.[16]

---

[16] Our conclusion, along with defendants' concessions, means that we need not
separately consider the evidentiary issues raised secondarily and less substantially in
defendants' briefs, including the absence of an evidentiary hearing, the purported
lack of particularity in the district court's findings, and the admission of one piece of
hearsay evidence. As noted earlier, defendants confirmed at oral argument that "for
purposes of this appeal, [they were] proceeding with the findings of fact the district
court made." Oral Argument at 4:21–4:28; *see also id.* at 3:343:44 (counsel stating
that focus would be on distinguishing this case from *Hockenberry*, where we
remanded for district court to make factual findings on controverted issues). They
relatedly confirmed that they were only arguing legal error in the district court's
determination that their acts were not within the scope of their employment. *See* Oral
Argument at 3:46–4:00 (counsel stating that "*even with* the evidentiary issues,"
scope-of-employment issue "still could have been decided as a matter of law based
on the scope-of-employment standard in Colorado and corresponding caselaw in
Colorado" (emphasis added)). Given this waiver, we also need not decide whether the
district court abused its discretion by resolving disputed factual matters and making
credibility findings without conducting an evidentiary hearing. *See Hockenberry*,
42 F.4th at 1174–75 (explaining that "[i]f there are disputed issues of fact, the district

**Conclusion**

Based on the facts found by the district court, defendants were acting outside the scope of their employment at the time of the events described in the complaint. We therefore affirm the district court's order striking the Westfall certification and allowing plaintiffs' state-law claims to proceed against the individual defendants. As a final matter, we grant defendants' unopposed motion to seal volume ten of the appendix.

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

court should hold such hearings as appropriate (*including an evidentiary hearing if necessary*), and make the findings necessary to decide the Westfall certification question" (emphasis added) (quoting *Fowler*, 647 F.3d at 1241)); *Kearns v. United States*, 23 F.4th 807, 812 (8th Cir. 2022) (explaining that when Westfall certification presents genuine issues of material fact, district court should "proceed to an evidentiary hearing" and "take[] the role of fact-finder to resolve those issues of material fact").