**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

**December 16, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

BRIAN HALLUM,

    Plaintiff - Appellant,

v.

SHERIFF OF DELAWARE COUNTY, in
his official capacity; RONALD
WILLIAMS,

    Defendants - Appellees,

JERRY TROUT,

    Defendant.

No. 24-5012
(D.C. No. 4:21-CV-00137-GKF-SH)
(N.D. Okla.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **MATHESON**, **McHUGH**, and **ROSSMAN**, Circuit Judges.
_____

After receiving some upsetting news, Brian Hallum drove to his business, a marijuana dispensary in Delaware County, Oklahoma. There, he had four shots of tequila and a marijuana gummy. He then began destroying items in the dispensary,

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

such as display cases, cannabis paraphernalia, and speakers. He also scattered money across the floor. Afterwards, he went to the parking lot and fell asleep in his car.

Unbeknownst to Mr. Hallum, he had pulled a burglary alarm while in the dispensary. Deputy Ronald Williams of the Delaware County Sheriff's Office responded to the alarm. He arrived at the dispensary shortly after midnight, along with two other officers. While the other officers stayed by Mr. Hallum's vehicle, Deputy Williams searched the dispensary. When he came back outside, he saw Mr. Hallum take a step toward an officer, get pushed back by the officer, and then take two more steps—with arms extended at his sides—toward the officer. Deputy Williams rushed to Mr. Hallum and used an armbar maneuver to force him to the ground.

Mr. Hallum sued Deputy Williams under 42 U.S.C. § 1983, asserting an excessive force claim. The district court granted summary judgment to Deputy Williams based on qualified immunity. We affirm because Mr. Hallum has not shown a constitutional violation.

## I.    BACKGROUND

### A.    *Factual History*

On March 29, 2019, Mr. Hallum went to the marijuana dispensary he owned after learning some distressing information. At the dispensary, he took four shots of tequila, ate a marijuana gummy, and then "deliberately trashed his dispensary and destroyed property in his store, including glass display cases, a security alarm horn, pipes, bongs, and other cannabis paraphernalia." App. Vol. II at 228. He also

2

"scattered hundreds of dollars of bills throughout the area" and accidentally activated the dispensary's commercial burglary alarm. *Id.* Afterwards, he went to the parking lot and fell asleep in his vehicle.

At 12:06 a.m. on March 30, Deputy Williams was dispatched to the dispensary to respond to the burglary alarm. The dispensary's security cameras captured video footage of Deputy Williams, along with Deputy Thomas Beck, arriving at the store and parking near a red vehicle.[1] Deputy Williams saw Mr. Hallum "slouched in the passenger seat" of the vehicle and heard "very loud music coming from inside the building." *Id.* at 229.[2] Through the store's window, Deputy Williams could see a portion of the front lobby, which had "shattered pots and dirt and plants strewn about." *Id.* at 229.

Bernice Police Officer Jerry Trout was dispatched to the scene as backup. When he arrived, Deputy Williams instructed Deputy Beck and Officer Trout to stay with the vehicle and ensure Mr. Hallum's safety while he checked the dispensary's interior. Deputy Williams approached the building, looked through the window

---

[1] Although there is video footage of the encounter between Mr. Hallum and the officers, there is not an audio recording of anything that occurred before the takedown.

[2] Mr. Hallum argues that Deputy Williams knew Mr. Hallum was the dispensary owner before the takedown, but Deputy Williams claims he did not learn Mr. Hallum's identity until after. Because our conclusion is the same regardless, we assume that Mr. Hallum is correct and that Deputy Williams recognized him as the dispensary owner before the takedown.

again, and saw broken glass along with the shattered pots. He then walked to the rear of the building and examined the door, which looked like someone had tried to open it with a pry bar. The door was unlocked, so Deputy Williams went inside, where he saw "personal items and a lot of hundred dollar bills in cash strewn about." *Id.* at 229. Other items were also strewn about, including broken glass and plastic, and speakers had been ripped from the wall.

Back at the vehicle, Mr. Hallum woke up, and Officer Trout informed him they were responding to a burglary alarm. The video footage shows Officer Trout opening the vehicle's door, and Mr. Hallum getting out and standing with his back to his vehicle and with Officer Trout facing him. The two men spoke for several minutes while Deputy Beck walked away from the vehicle and toward Deputy Williams, who was returning from the dispensary. While the deputies were walking back to the vehicle, Mr. Hallum took a step toward Officer Trout. As Mr. Hallum was taking a second step forward, Officer Trout used one arm to push Mr. Hallum in the shoulder and back toward his vehicle. Mr. Hallum then extended his arms at his sides and took two more steps toward Officer Trout.

After Mr. Hallum took his second step, Officer Trout again pushed him back toward the vehicle. Deputy Williams, who was still walking back from the dispensary, saw Mr. Hallum step toward Officer Trout, get pushed back, take two more steps forward, and get pushed back again. Immediately after the second push, when Mr. Hallum's arms were extended, Deputy Williams approached Mr. Hallum, grabbed his right arm, and used an armbar maneuver to force him to the ground. The

4

dispensary's security cameras captured this encounter between Officer Trout,

Mr. Hallum, and Deputy Williams.

During the takedown, Mr. Hallum's face struck the pavement, causing his nose

to bleed. As he was on the ground, the officers handcuffed him and searched him for

weapons. Ultimately, Deputy Williams arrested Mr. Hallum for public intoxication.

A Delaware County judge found probable cause to detain Mr. Hallum, but the

Delaware County district attorney later moved to dismiss the charge.

### B.    Procedural History

Mr. Hallum brought this § 1983 suit in federal court, asserting an excessive

force claim against Deputy Williams for using the armbar maneuver.[3]

Deputy Williams moved for summary judgment, arguing he is entitled to qualified

immunity. The district court granted Deputy Williams's motion, concluding that

Mr. Hallum had not shown a constitutional violation, let alone a clearly established

constitutional violation.

To decide if there was a constitutional violation, the district court analyzed the

use-of-force factors outlined in *Graham v. Connor*: (1) "the severity of the crime at

---

[3] Mr. Hallum also asserted a municipal liability claim against the Sheriff of Delaware County and a false arrest/imprisonment claim against Deputy Williams. The district court granted summary judgment to the Sheriff and Deputy Williams on these claims, and Mr. Hallum has not challenged those rulings on appeal. Additionally, Mr. Hallum brought claims against Deputy Beck and Officer Trout, but those claims were dismissed before summary judgment and are not at issue on appeal.

issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. 386, 396 (1989). After reviewing the undisputed facts, the district court concluded that (1) the "circumstances presented to Deputy Williams raised the reasonable likelihood of a commercial burglary—a serious crime," (2) Deputy Williams reasonably believed Mr. Hallum was a threat to Officer Trout's safety, and (3) the third factor was "inapplicable" because "Mr. Hallum's actions do not suggest an attempt to flee, and Officer Trout was not attempting to arrest [Mr.] Hallum." App. Vol. III at 662, 664. Weighing these factors, the district court concluded that "Deputy Williams employed an objectively reasonable armbar takedown." *Id.* at 664. The district court thus granted summary judgment in Deputy Williams's favor, and Mr. Hallum timely appealed.

## II.    DISCUSSION

We first outline the applicable legal standard and then explain why Mr. Hallum has failed to show a constitutional violation.

### A.    *Legal Standard*

This court "review[s] *de novo* a grant of summary judgment based on qualified immunity." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

6

In applying this standard, courts "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021) (quotation marks omitted). "More specifically, where the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts," the disputed facts must be resolved in the nonmoving party's favor. *Id.* (quotation marks omitted). But a factual dispute must be based in the record—"the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Accordingly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Relatedly, a court should not adopt a version of events "to the extent that there is *clear contrary* video evidence of the incident at issue." *Est. of Taylor*, 16 F.4th at 757 (quotation marks omitted).

"Reviewing summary judgment in the qualified immunity context involves a two-part inquiry." *Est. of Larsen*, 511 F.3d at 1259. Under this inquiry, the plaintiff must show (1) that the defendant "violated a federal constitutional or statutory right" and (2) that the right "was clearly established at the time of the defendant's conduct." *Heard v. Dulayev*, 29 F.4th 1195, 1203 (10th Cir. 2022) (quotation marks omitted). The court need not address both prongs "if one is dispositive." *Id.*

### B.    Constitutional Violation

"Excessive force claims are governed by the Fourth Amendment's 'objective reasonableness' standard." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010) (quoting *Graham*, 490 U.S. at 388). Under this standard, the "ultimate question 'is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) (quoting *Graham*, 490 U.S. at 397). Thus, courts must focus "on the information the officers had at the time of the encounter." *Est. of Taylor*, 16 F.4th at 748 n.1 (quotation marks omitted). And because the standard is objective, an officer's subjective motivations are irrelevant—"[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

To determine whether conduct was objectively reasonable, courts consider the three non-exhaustive *Graham* factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. But ultimately, the analysis is based on the totality of the circumstances. *See id.*

We consider each *Graham* factor in turn and conclude that it was objectively reasonable for Deputy Williams to use the armbar maneuver. Therefore, there was no Fourth Amendment violation.

1.      **Severity of the Crime**

For this factor, courts consider the crimes the officer could have reasonably believed the suspect committed or was about to commit. *See Morris v. Noe*, 672 F.3d 1185, 1195 n.4 (10th Cir. 2012). As we now explain, at the time of the takedown, Deputy Williams could have reasonably believed Mr. Hallum was about to commit the serious crime of assaulting a police officer.[4]

Before the takedown, Deputy Williams had seen Mr. Hallum in the dispensary's parking lot and had seen the destruction inside the dispensary. Thus, Deputy Williams could have reasonably believed that Mr. Hallum caused the destruction and could have been reasonably concerned about Mr. Hallum's temperament. Additionally, Deputy Williams saw Mr. Hallum step toward Officer Trout, get pushed back, and then take two more steps toward Officer Trout with arms extended at his sides. This behavior, combined with the scene inside the dispensary, could have led Deputy Williams to reasonably believe that Mr. Hallum was about to assault Officer Trout. And we have recognized that a "forceful

---

[4] The district court concluded that Deputy Williams could have reasonably believed Mr. Hallum had committed commercial burglary. Because we assume for purposes of our analysis that Deputy Williams was aware that Mr. Hallum was the owner of the business, however, we focus on Deputy Williams's alternative argument that he reasonably believed Mr. Hallum was about to assault Officer Trout. *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016) ("To prevent cases from needlessly bouncing back and forth between district and appellate courts, this court is entitled to affirm a district court on alternative grounds that court didn't consider if those grounds are adequate, apparent in the record, and sufficiently illuminated by counsel on appeal.").

takedown or 'throw down' may very well be appropriate in arrests or detentions for assault, especially if the officer is trying to prevent an assault." *Morris*, 672 F.3d at 1195.

Mr. Hallum does not dispute that assaulting an officer is a serious crime. Rather, he maintains that he posed no threat because he was "backing away from Officer Trout with his hands in the air to indicate surrender." Appellant's Br. at 18. The video footage from the dispensary clearly contradicts this claim. First, the video shows Mr. Hallum take one step toward Officer Trout, get pushed back, take two more steps toward Officer Trout, and get pushed back a second time. To the extent Mr. Hallum "back[ed] away" from Officer Trout, it was only because Officer Trout pushed him away. Second, the video clearly shows that Mr. Hallum's hands were not "up in a surrendering posture." *Id.* at 4. The video shows Mr. Hallum move *toward* Officer Trout with arms outstretched to his sides, so a reasonable jury could not believe that Mr. Hallum was in a "surrendering posture." *See Scott*, 550 U.S. at 380 (stating courts should not adopt version of facts so "blatantly contradicted by the record" that "no reasonable jury could believe it").

For these reasons, the first *Graham* factor weighs in Deputy Williams's favor.

**2.   Threat to the Officers**

The second *Graham* factor—whether the suspect posed an immediate threat to the safety of the officers or others—"is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (quoting *Bryan v.*

*MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). To evaluate the potential threat, courts often consider four non-exhaustive factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[5] *Est. of Larsen*, 511 F.3d at 1260.

As to the first factor, Mr. Hallum was not armed, but he took two steps toward Officer Trout after Officer Trout pushed him back the first time. This shows that Mr. Hallum was not complying with police commands. Second, although Mr. Hallum was not armed, he had his arms extended at his sides when he moved toward Officer Trout. Mr. Hallum contends this was a "surrendering posture," but regardless of Mr. Hallum's intent, Deputy Williams could have reasonably perceived it as threatening. Third, it is unclear exactly how close Officer Trout and Mr. Hallum were standing, but they were within arm's reach at least twice because Officer Trout pushed Mr. Hallum twice. When the two men were within arm's reach, it was reasonable to view Mr. Hallum as a threat because he could have reached for Officer Trout's weapons. *See Coronado v. Olsen*, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. Jan. 18, 2022) (unpublished) (concluding that a suspect was a threat

---

[5] In *Estate of Larsen ex rel. Sturdivan v. Murr*, an officer shot and killed a man who had a long knife. 511 F.3d 1255, 1258 (10th Cir. 2018). For that reason, the *Estate of Larsen* factors focus on armed suspects and do not explicitly reference the threat posed by unarmed suspects.

because had he "approached [the officers] any closer, he would have been within reaching distance of their weapons").[6] Fourth and finally, Mr. Hallum's refusal to stay back supported a reasonable belief that Mr. Hallum intended to cause harm.

Considering the totality of the circumstances, it was objectively reasonable to believe Mr. Hallum posed an immediate threat to Officer Trout. This conclusion is supported by *Gallegos v. City of Colorado Springs*, where we similarly concluded that officers reasonably believed their safety was threatened. 114 F.3d 1024, 1031 (10th Cir. 1997). In *Gallegos*, two police officers responded to reports of a "prowler." *Id.* at 1026. The officers found a distraught man walking down the street, and they tried to question him, but he refused. *Id.* One of the officers grabbed the suspect's arm twice, but each time he jerked away. *Id.* The suspect then walked away and began shouting, but an officer followed him and grabbed his shoulder. *Id.* In response, the suspect jerked away, pivoted to face the officers, and settled into a crouch with his "fists clenched at waist level." *Id.* One officer backed up, but the other officer stepped toward the suspect and executed an armbar. *Id.* The other officer moved in and forced the suspect to the ground. *Id.*

On appeal, we considered whether the suspect was subject to an arrest under the Fourth Amendment and held the officers acted reasonably. *Id.* at 1031. We concluded it was objectively reasonable for the first officer to use an armbar

---

[6] We cite unpublished decisions for their persuasive value only and do not treat them as binding precedent. 10th Cir. R. 32.1(A).

maneuver because she reasonably feared for her safety. *Id.* And it was reasonable for the other officer to use a takedown maneuver because he "harbored an objectively reasonable belief there was a serious risk [the man] would strike [the other officer] with his free arm." *Id.*

Like the officers in *Gallegos*, Deputy Williams was confronted with a potentially distraught person who exhibited aggressive behavior by violently destroying his own place of business and advancing toward Officer Trout after being pushed back. If anything, the suspect in *Gallegos* was less threatening than Mr. Hallum because the suspect did not step *toward* the officers. Accordingly, *Gallegos* supports our conclusion here that it was reasonable to believe Mr. Hallum posed a threat to Officer Trout's safety.

Considering all facts, this factor weighs in Deputy Williams's favor.

**3.      Actively Resisting or Attempting to Evade Arrest**

The third factor—whether the suspect is actively resisting arrest or attempting to evade arrest—can weigh in an officer's favor if the plaintiff disobeyed police commands. *See, e.g.*, *Coronado*, 2022 WL 152124, at *5 (agreeing that the plaintiff's "advance could reasonably be interpreted by the officers as an intention to resist officers' commands, and therefore the officers acted reasonably in believing [the plaintiff] was resisting arrest and the use of force was justified"); *Heard*, 29 F.4th at 1207 (considering the plaintiff's failure to stop when commanded and citing *Coronado*). Although Officer Trout did not give a verbal command, his push could

not reasonably be interpreted as anything but a command to stay back.[7] Nevertheless, Mr. Hallum took two more steps forward, necessitating a second push. Under these circumstances, Deputy Williams could have reasonably believed Mr. Hallum was disobeying police commands and thus actively resisting.

The district court, however, concluded this factor was "inapplicable" because "Officer Trout was not attempting to arrest" Mr. Hallum. App. Vol. III at 664. And Mr. Hallum contends this factor should weigh "heavily" in his favor because he was not under arrest. Appellant's Br. at 20. But Mr. Hallum does not cite—and we were unable to find—any authority holding that if the plaintiff was not under arrest, the third *Graham* factor must weigh in the plaintiff's favor, even if the plaintiff was disobeying police commands and moving toward an officer. Nor were we able to find authority holding that under these circumstances, the third *Graham* factor cannot cut against the plaintiff. But for purposes of this appeal, we assume the third *Graham* factor is neutral because Mr. Hallum was not under arrest. Nonetheless, when weighing all factors, we still consider Mr. Hallum's failure to obey police commands because "in the end the inquiry is always whether . . . the totality of the circumstances justified the use of force." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

---

[7] Because there is no audio recording at this point in the encounter, we are unable to determine whether Officer Trout's pushes were accompanied by verbal commands. Construing the facts in Mr. Hallum's favor, we assume there were no verbal commands. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021).

\* \* \*

In short, Deputy Williams was responding to an alarm late at night, saw the destruction inside Mr. Hallum's dispensary, and saw Mr. Hallum step toward Officer Trout, get pushed back, and then take two more steps forward, with his arms extended at his sides. Considering the information available to Deputy Williams at the time, it was objectively reasonable for him to believe force was necessary to protect Officer Trout. Thus, Mr. Hallum has not shown Deputy Williams violated his Fourth Amendment right to be free from excessive force, and Deputy Williams is entitled to qualified immunity.

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order granting summary judgment in favor of Deputy Williams.

Entered for the Court

Carolyn B. McHugh
Circuit Judge